**Willi MOELLER, Appellant,**

v.

**IONETICS, INC., Appellee.**

**Appeal No. 85–2646.**

United States Court of Appeals, Federal Circuit.

June 4, 1986.

---

C. Frederick Leydig, Leydig, Voit & Mayer, Ltd., Chicago, Ill., argued for appellant. With him on brief, were John W. Kozak and Charles H. Mottier. John H. Brinsley, Adams, Duque & Hazeltime, Los Angeles, Cal., of counsel.

Ira M. Siegel, Blakely, Sokoloff, Taylor & Zafman, Beverly Hills, Cal., argued for appellee. With him on brief, were Roger W. Blakely and Stephen D. Gross.

Before FRIEDMAN, Circuit Judge, NICHOLS, Senior Circuit Judge, and SMITH, Circuit Judge.

NICHOLS, Senior Circuit Judge.

Willi Moeller (Moeller), having sued Ionetics, Inc. for infringement, appeals from the October 15, 1984, grant of partial summary judgment of noninfringement of claim 4 of Patent No. 3,562,129 (the '129 patent) by the District Court of the Central District of California, No. 83–7551–DAR. We vacate and remand.

## Background

### A. *The Patent*

The invention of the '129 patent is directed toward an electrode system for measuring the concentration of cations, positively charged ions. Here the concentration of potassium ion, a type of cation, is selectively measured in the presence of other cations. A barrier is interposed between these other cations and the sensing device so that the electrode system only "sees" potassium.

The barrier of the patent's electrode system is a membrane bearing certain "cation-specific" components, such as nonactin, gramicidin, and valinomycin which will recognize only potassium. Upon recognition, the cation-specific components and potassium form positively charged complexes which the sensing device, on the opposite side of the membrane, detects. The electrode system measures these positively charged complexes and thus indicates potassium ion concentration. Claim 4 is at issue:

An electrode system useful for measuring cation activities, said electrode system comprising a membrane, means including an electrode body for supporting the membrane, and an electrode disposed within said body, said membrane comprising a cation-specific component which forms a complex with a cation, the activity of which is to be determined, said cation-specific component being at least one member selected from the group con-

sisting of nonactin, homologues of nonactin, gramicidins and valinomycin, and an inert carrying material.

### B. *The Ionetics Device*

Ionetics manufactures an electrode system portrayed below:

Ionetics' Electrode System

The Ionetics' electrode system comprises:

a silver wire to conduct electrical occurrences (1);

a plastic tube for insulating the conductor surrounding the conductor leading to the sensing portion of the electrode system (2);

a silver sensing portion (3);

a coating overlying the electrode (4);

a layer of PVC membrane material having valinomycin embedded therein (5);

an adhesive sealant for sealing the gap between the membrane and the insulating tube to prevent seepage of the test solution (6).

As indicated *infra*, there is some dispute as to this structure.

### C. *District Court Proceedings*

On June 18, 1984, Ionetics filed a motion for partial summary judgment of non-infringement relating solely to claim 4 of the '129 patent. The court granted Ionetics' motion on October 15, 1984. Moeller moved for reconsideration; the court denied the motion. Subsequently, after requesting and receiving certification of the order for appeal, both parties petitioned this court for permission to appeal the October 15 order, pursuant to 28 U.S.C. § 1292(b), which we granted.

The district court determined that: (1) "electrode" describes only the sensitive tip of the electrode, even though "the patent specification variously refers to both the electrode assembly and the sensitive tip as 'the electrode;'" (2) "electrode body" means the outer impermeable casing of the electrode, excluding the membrane, and (3) "disposed in said body" means that the functional tip is within the confines of the electrode body.

A comparison of the claim and the Ionetics' device, both of which the court found to be sufficiently simple to be understood without the aid of experts, demonstrated to the district court that there was no literal infringement. Specifically, the court determined that, unlike the subject invention of the '129 patent, the Ionetics' electrode protruded from the electrode body and is covered by other material and the membrane itself rather than the body.

Finally, the court concluded as a matter of law that the Ionetics' device falls within the range of equivalents specifically relinquished during prosecution, explaining that the file wrapper unambiguously shows a final limitation to an electrode disposed in a body and finding that Ionetics' electrode protrudes from the body.

### Opinion

#### A. *Jurisdiction*

The parties appeal the October 15, 1984 order pursuant to 28 U.S.C. § 1292(b) which provides in pertinent part:

When a district judge, in making in a civil action an order not otherwise ap-

pealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing such order. This court, having granted the parties permission to appeal, has jurisdiction to consider the controlling question of law and all other questions material to the trial court's order. *See United States v. Connolly,* 716 F.2d 882, 884–85 (Fed.Cir.1983), *cert. denied,* 465 U.S. 1065, 104 S.Ct. 1414, 79 L.Ed.2d 740 (1984) (so holding for both 28 U.S.C. § 1292(d)(2) and analogous provision 28 U.S.C. § 1292(b) ).

### B. *Summary Judgment*

Summary judgment, under Rule 56, Fed. R.Civ.P., is as appropriate in patent cases as in other cases where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *See SRI International v. Matshusita Electric Corp.,* 775 F.2d 1107, 1116, 227 USPQ 577, 581–82 (Fed.Cir.1985) (in banc) (and cases cited therein); *Molinaro v. Fannon/Courier Corp.,* 745 F.2d 651, 653–54, 223 USPQ 706, 707 (Fed.Cir.1984). The district court must view the evidence in a light most favorable to the nonmovant (here, Moeller), and draw all reasonable inferences in its favor and must resolve all doubt over factual issues in favor of the party opposing summary judgment. *SRI International,* 775 F.2d at 116.

This court stated in *D.M.I., Inc. v. Deere & Co.,* 755 F.2d 1570, 1573, 225 USPQ 236, 238 (1985):

> It is at least conceivable that comparison of a properly interpreted claim with a stipulated or uncontested description of an accused device or process would reflect such an absence of material fact issue as to warrant summary judgment of infringement or noninfringement.

In that regard, this court on occasion has upheld the grant of summary judgment in favor of accused infringers where there were no genuine issues of material fact,

the trial court had properly construed the claims, and a finding of infringement would have been impossible. *See, e.g., Porter v. Farmers Supply Service, Inc.,* 790 F.2d 882, 884 (Fed.Cir.1986).

The *D.M.I.* court warned, however, that because infringement is itself a fact issue, "a motion for summary judgment of infringement or noninfringement should be approached with a care proportioned to the likelihood of its being inappropriate." *Id.*

Despite the care apparent in the district court's order, we must vacate the court's grant of summary judgment for reasons to be made clear below.

### C. *Claim Construction and Literal Infringement*

The first step in determining infringement is to construe the claims. *Loctite Corp. v. Ultraseal, Ltd.,* 781 F.2d 861, 866, 228 USPQ 90, 93 (Fed.Cir.1985). The then-properly construed claims are compared to the alleged infringing device. *Id.* Improper claim construction can therefore distort the entire infringement analysis. That happened here.

The district court stated that claim interpretation is a question of law for the court to decide unless some ambiguity exists in the claim's language requiring the admission of extrinsic evidence to explain the ambiguity. It concluded that the three terms at issue, "electrode," "electrode body," and "disposed in said body" are unambiguous as a matter of law and, hence, there was no need for expert testimony to construe the claims.

■ We agree that claim interpretation is a question of law. *McGill, Inc. v. John Zink & Co.,* 736 F.2d 666, 671, 221 USPQ 944, 948 (Fed.Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 514, 83 L.Ed.2d 404 (1984). However, resort to certain extrinsic evidence (*i.e.,* the specification, prosecution history, and other claims) is always necessary to interpret disputed claims. *Palumbo v. Don-Joy Co.,* 762 F.2d 969, 974–75, 226 USPQ 5, 8 (Fed.Cir.1985); *McGill,* 736 F.2d at 672–76, 221 USPQ at 949; *From-*

*son v. Advance Offset Plate, Inc.,* 720 F.2d 1565, 1569–71, 219 USPQ 1137, 1140–43 (Fed.Cir.1983).

Here, the meanings of key terms in the claim were clearly disputed. For example, Ionetics asserted that "electrode" refers only to the ion selective tip of its product and did not include the entire length of silver wire. In opposing the motion for summary judgment, Moeller offered one of its expert's declarations, explaining that the term "electrode" is commonly used in three distinct senses:

(1) The entire system (as in the patent of Ionetics' president, Kater);

(2) The entire length of electrically conductive wire; and

(3) The tip of wire to be immersed into the solution.

It seems fairly obvious that under the second meaning, Ionetics' electrode device is at least partially within the body. If the membrane is part of the body, it is wholly within. The district court itself acknowledged the dispute. On pages 8 and 10 of her October 15th order, the judge recognized that the patent specification variously refers to both the electrode assembly and the sensitive tip of the electrode as "the electrode." As a further complication, claim 4 refers not only to an "electrode," but also to an "electrode system" and an "electrode body."

▮ Nonetheless, the district court here refused to allow one type of extrinsic evidence, expert testimony, on the meaning of the claims. Although use of experts is generally a matter of discretion with the trial judge, *Seattle Box Co. v. Industrial Crating & Packaging, Inc.,* 731 F.2d 818, 826, 221 USPQ 568, 573 (Fed.Cir.1984), that discretion is not unlimited. In a patent case involving complex scientific principles, it is particularly helpful to see how those skilled in the art would interpret the claim. *See, e.g., Palumbo,* 762 F.2d at 975, 226 USPQ at 8; *McGill,* 736 F.2d at 675–76, 221 USPQ at 950; *Fromson,* 721 F.2d at 1571, 219 USPQ at 1140–42. Indeed, the test of claim interpretation is directed to one skilled in the art, *Loctite,* 781 F.2d at

867, 228 USPQ at 93, and it makes sense therefore to elicit testimony from such individuals. Though we do not establish that as a requirement in all cases, *cf. Moleculon Research Corp. v. CBS Inc.,* 793 F.2d 1261, 1270 (Fed.Cir.1985), and leave it to the general discretion of the trial judge, we conclude that in this case the trial judge's failure to allow such testimony was an abuse of discretion.

The district court determined that "the devices are sufficiently simple that they can be understood without the aid of experts." We, however, do not share the district court's view of "simplicity" in the technology involved here. In deciding whether to grant summary judgment, we do not think that the district court was justified in treating the interpretation of these claims as so "simple" that the question could be resolved without expert testimony. In our view, the district court's finding of infringement rested on an interpretation of the claim that, looking just at the literal language used, cannot stand.

The summary judgment of no literal infringement therefore must be vacated and the case remanded for further proceedings, including proper claim construction in light of extrinsic evidence including expert testimony. The district court's findings of differences between the claimed invention and the accused device will, of course, be affected by any new claim interpretation.

On remand, the district court should be aware that, although claim construction is a legal question, underlying fact disputes may arise pertaining to extrinsic evidence that might preclude summary judgment treatment of claim construction. *See, e.g., Palumbo,* 762 F.2d at 973–77, 226 USPQ at 7–10. Further, there exists an apparent conflict of opinion as to the description of the allegedly infringing Ionetics device that, unless resolved, could be another genuine dispute of fact. Moeller contends that the allegedly infringing Ionetics Electrode System is disclosed in U.S. Patent No. 4,340,457, Ion Selective Electrodes, to J. Kater, the president of Ionetics. In his declaration, Mr. Kater appears to equate

the electrode body with the insulating tube (in asserting that the electrode body does not support the membrane) whereas Dr. J. Leonard, another of Ionetics' experts, declares that "the insulator tube is not an electrode body." The district court acknowledged that "there are some ambiguities in defendant's experts' description of the device" but found the differences to be immaterial, apparently in light of the simplicity of the device. As stated *supra,* we do not agree with the judge's characterization of simplicity. Moreover, we reiterate that all inferences in a summary judgment motion must be drawn in favor of the nonmovant. This the district court failed to do.

### D. *Prosecution History Estoppel*

■ Even if there is no literal infringement, there can be infringement under the doctrine of equivalents. *Atlas Powder v. E.I. duPont de Nemours & Co.,* 750 F.2d 1569, 1579, 224 USPQ 409, 416 (Fed.Cir. 1984). If the accused device and claimed invention perform substantially the same function in substantially the same way to give substantially the same result, there is equivalence. *Id.*

The district court acknowledged a legitimate factual dispute on equivalence. However, it ruled as a matter of law that prosecution history estoppel necessarily precluded the patentee here from covering the accused device under the doctrine of equivalents. We disagree.

The district court used what it perceived as an "unambiguous" prosecution history to limit severely coverage under the '129 patent. We do not view the prosecution history in that light, and have the benefit of cases decided after the district court opinion, specifically *Loctite Corp. v. Ultraseal,* 781 F.2d 861, 228 USPQ 90 (Fed.Cir. 1985). The grant of summary judgment is also unsupportable so far as based on prosecution history estoppel.

### (1) *Prosecution History*

The original application, filed by Professor Wilhelm Simon, contained claims 1 and 2:

1. An electrode system used for measuring ion activities and having a membrane, in which said membrane comprises, as an ion-specific component, nonactin or its homologues, gramicidin and/or valinomycin.

2. An electrode system as claimed in claim 1, in which the membrane comprises the ion-specific component and an inert material.

The examiner rejected these claims as obvious over Graven et al. disclosing the antibiotics nonactin, gramicidin and valinomycin to be ion-specific in a biological system—rat mitochondria—in view of Ilani or Ross disclosing the incorporation of ion-specific substances in the pores of an inert carrier to form a membrane in electrode systems. The examiner reasoned that it would have been obvious to incorporate the Graven et al. antibiotics in the porous inert carrier of the secondary references so as to provide a compact sensing device.

By amendment, Professor Simon rewrote the claims as 11 and 12, limiting the measurement to *cat*ion activity and adding:

said electrode system comprising a membrane, which comprises a cation-specific component, which forms a complex with the cation, the activity of which is to be determined, said cation-specific component being at least one member selected from the group consisting of * * *.

In his final action, the examiner again rejected claims 11 and 12 as obvious in view of the prior art.

Professor Simon then introduced new claim 34, combining both 11 and 12 and adding "means including an electrode body for supporting the membrane." Professor Simon intended this new language, *i.e.,* the electrode body, to "explicitly point[ ] out that the claimed invention is an electrode system, as distinguished from a mitochondrial suspension or other material to be analyzed."

In subsequent telephone conversations, the examiner agreed that the application would be in condition for allowance with

the addition of an examiner's amendment, the insertion of the phrase "an electrode disposed in said body." The purpose of the examiner's amendment, expressly stated, was to "more particularly point out the invention." The patent issued on February 9, 1971, and was assigned to Moeller.

### (2) *District Court*

The district court determined that the prosecution history "unambiguously shows that plaintiff had originally claimed all electrode systems, but at the last minute agreed to limit his claim to the subset of electrode systems having an electrode disposed in the electrode body," *i.e.*, not protruding. Because the court had already made the unreasonable assumption that the accused device has the electrode outside the body, the court held that prosecution history estoppel precluded Moeller from applying the doctrine of equivalents.

### (3) *The Law*

*Loctite*, 781 F.2d at 871, 228 USPQ at 96, reiterates what was earlier said in *Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 1362, 219 USPQ 473, 481 (Fed.Cir. 1983) and *Bayer Aktiengesellschaft v. Duphar International Research, B.V.*, 738 F.2d 1237, 1243, 222 USPQ 649, 653 (Fed. Cir.1984), specifically:

> Amendment of claims is a common practice in prosecution of patent applications. No reason or warrant exists for limiting application of the doctrine of equivalents to those comparatively few claims allowed exactly as originally filed and never amended. Amendments may be of different types and may serve different functions. Depending on the nature and purpose of an amendment, it may have a limiting effect within a spectrum ranging from great to small to zero.

The court went on to add that:

> [W]henever the doctrine is evoked, "a close examination must be made as to, not only what was surrendered, but also the reason for such a surrender"; the fact that claims were narrowed "does not always mean that the doctrine of file

history estoppel completely prohibits a patentee from recapturing some of what was originally claimed."

*Id.*, 781 F.2d at 871, 228 USPQ at 96. *Loctite* discussed *Kinzenbaw v. Deere & Co.*, 741 F.2d 383, 222 USPQ 929 (Fed.Cir. 1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 1357, 84 L.Ed.2d 379 (1985), a case relied on by the district court here, as limited to its facts and exemplary of the need to apply "prosecution history estoppel as a legal matter on a case-by-case basis, guided by equitable and public policy principles underlying the doctrines involved and by the facts of the particular case." *Id.* at n. 7, 781 F.2d at 871, 228 USPQ at 96.

Moeller argues that his amendment was made not to, and did not, limit his claims to certain types of electrode systems. Weighing fact inferences in Moeller's favor, which we must do in a summary judgment context, we cannot disagree. Moeller believes that what distinguished his invention from the prior art was his use of valinomycin in an electrode system, as opposed to use in the rat system of Gaven et al. To so emphasize, in addition to his claim preamble that indicated "electrode system," he amended the body of his claim to make clear that the invention was limited to electrode systems. Although the examiner found the first amendment, inclusion of "electrode body," to be insufficient, the second amendment, inclusion of "electrode dispersed in the electrode body," was sufficient. Possibly, in the examiner's mind, it was needed to exclude potential application of the claim language to read on future devices that might do the job in a different way, but if it was intended not to read on such a device as that of Ionetics, it failed to do so with any clarity.

There is no indication that Professor Simon in any way limited, or intended to limit, the claims to a specific type of electrode system, *e.g.*, one where the electrode was completely within the body. As stated in the Examiner's Amendment, the addition was to "particularly point out" the inven-

660

tion. Thus, Professor Simon was more clearly claiming what he regarded as the invention: use of a cation-selective component in an electrode system. *See, e.g., Datascope Corp. v. SMEC, Inc.,* 776 F.2d 320, 325 n. 7, 227 USPQ 838, 842 n. 7 (Fed.Cir. 1985); *Caterpillar Tractor Co. v. Berco, S.P.A.,* 714 F.2d 1110, 1115, 219 USPQ 185, 187–88 (Fed.Cir.1983). Hence, we cannot on this record, in a summary judgment context, affirm the district court's application of prosecution history estoppel to limit Moeller from covering, under claim 4 of the '129 patent, an electrode system utilizing Moeller's invention or its equivalent, merely because the electrode protrudes somewhat and thus is not altogether within the so-called electrode body. In both devices, it is the membrane and not the body that separates the electrode tip from the solution to be tested.

We note the conflicting affidavits (one of which Ionetics argues is not properly before us) on whether the Manual of Patent Examining Procedure (MPEP) § 1302.04 allows the United States Patent and Trademark Office to make substantive changes by Examiner's Amendment. We need not resolve that issue now. Even if the MPEP does allow such amendments, we read the record, with inferences to Moeller, as showing that Moeller changed the claims merely to more particularly point out what was always intended, *i.e.,* that the claim was limited to electrode systems.

### Conclusion

We vacate the district court's grant of summary judgment on claim construction as to the meaning of "electrode," and remand for an interpretation of the claims in light of extrinsic evidence. We further vacate the district court's determination of noninfringement based on prosecution history estoppel and remand for a determination, consistent with this opinion, of whether there is infringement under the doctrine of equivalents.

VACATED AND REMANDED.