**SAFE FLIGHT INSTRUMENT CORPORATION, Plaintiff,**

v.

**SUNDSTRAND DATA CONTROL, INC., Defendant.**

**Civ. A. No. 87–545 JRR.**

United States District Court, D. Delaware.

Feb. 17, 1989.

Daniel F. Wolcott, Jr., of Potter, Anderson & Corroon, Wilmington, Del., of counsel: Edward V. Filardi, Robert Neuner, James J. Maune and Daniel A. DeVito, of Brumbaugh, Graves, Donohue & Raymond, New York City, and David E. Dougherty of Bacon & Thomas, Alexandra, Va., for plaintiff.

C. Waggaman Berl, Jr., Wilmington, Del., of counsel: Theodore W. Anderson, William M. Wesley, Richard A. Cederoth and Steven P. Petersen of Neuman, Williams, Anderson & Olson, Chicago, Ill., and Trevor B. Joike and Michael S. Yatsko of Sundstrand Corp., Rockford, Ill., for defendant.

## OPINION

ROTH, District Judge.

The plaintiff in this action, Safe Flight Instrument Corporation ("Safe Flight"), alleges that the defendant, Sundstrand Data Control, Inc. ("Sundstrand"), infringes its two patents, U.S. Patent Nos. 4,012,713 (the "'713 patent") and 4,079,905 (the "'905 patent"), which cover avionic windshear equipment. We denied the plaintiff's motion for a preliminary injunction by Memorandum Opinion and Order dated August 30, 1988. The defendant has now moved for summary judgment of noninfringement of the plaintiff's patents.

## I. FACTS

Windshear, or more specifically microburst, describes an aviation hazard which occurs when a plane on takeoff or landing encounters violent, quick, and local shifts in wind direction. This can result in disaster if the pilot cannot compensate quickly and properly for the changing conditions. Equipment for warning of the presence of windshear can be located either on the ground or on board the aircraft.

The two Safe Flight patents in suit cover on-board systems of detecting windshear. Windshear is measured in these patents by comparing the rate of change of the instantaneous airspeed (the speed of an aircraft measured against the surrounding air) with the change in groundspeed (the speed of an aircraft measured against the earth; this change in speed is also termed "horizontal inertial acceleration") and in the '905 patent, by adding a downdraft angle. As the defendant explained in its Opening Brief and at oral argument, because the two patents are similarly written only claim 1 of the '713 patent needs to be considered. If this claim is not infringed, then no claim of either patent is infringed. Defendant's Opening Brief at 3 (D.I. 54); Transcript of January 30, 1989, Oral Argument at 12 [hereinafter Transcript] (D.I. 95). Claim 1 of the '713 patent reads:

A system for generating a windshear signal representing the windshear condition encountered by an aircraft comprising:

means for generating a signal representing the rate of change of the instantaneous airspeed of the aircraft,

means for generating a signal representing the horizontal inertial acceleration of the aircraft,

means for subtracting the horizontal inertial acceleration signal from the rate of change of the instantaneous

airspeed signal to provide a windshear signal representing windshear, and

means for processing said windshear signal to provide an indication representing the magnitude thereof.

Schematically, the Safe Flight patents generates a windshear signal according to the following basic diagram:

Fig. 2. HORIZONTAL WINDSHEAR COMPUTATION

Affidavit of Philip A. Blythe [hereinafter Blythe Affidavit], Figure 2 (D.I. 81.2).

Sundstrand manufactures and sells several products known as Ground Proximity Warning Systems ("GPWS"). Sundstrand produces three types of GPWS that include a windshear warning capability: Part Numbers 965–0648 ("# 648"), 965–0676

("# 676"), and 965–0876 ("# 876") (collectively the "Sundstrand Parts"). Part # 648 uses one of The Boeing Company's algorithms [1] to calculate windshear; Parts # 676 and # 876 use algorithms of Sundstrand's own design to calculate windshear.[2] The following basic diagram represents Sundstrand's commercially produced method for generating a windshear signal:

1. As described in the Court's previous opinion, Safe Flight entered into a license arrangement with The Boeing Company ("Boeing") to permit "Boeing to manufacture wind shear equipment using the plaintiff's patented technology or to have a third party manufacture such equipment." *Safe Flight Instrument Corp. v. Sundstrand Data Control, Inc.*, slip op. at 2 (D.Del. Aug. 30, 1988) ("*Safe Flight I*") (D.I. 67). Boeing chose not to manufacture the equipment itself and instead contracted with Sundstrand to produce the wind shear devices to meet its needs. *Id.* at 3.

2. Although Sundstrand originally briefed its Motion for Summary Judgment of Noninfringement based only on Part # 648, Defendant's

Opening Brief at 3 (D.I. 54), the plaintiff, in opposing the Motion, argued that all three Parts, # 648, # 676, and # 876, infringe its patents. Plaintiff's Answering Brief at 2 (D.I. 81.1). Sundstrand maintains its position that it is entitled to summary judgment by arguing that none of its parts infringe the plaintiff's patents and by adopting Safe Flight's position that all of Safe Flight's charges against Sundstrand will fail if summary judgment is granted. *See* Defendant's Reply Brief at 1–2 n. 1 (D.I. 88); Transcript at 5 (D.I. 95). The analysis in this opinion, therefore, applies to all three Sundstrand Parts and addresses the plaintiff's assertion that all three Parts infringe its patents.

Fig. 3 ALTERNATE WINDSHEAR COMPUTATION

Blythe Affidavit, Figure 3 (D.I.81.2).

## II. ANALYSIS

A. *The Standard for Summary Judgment.* Rule 56 of the Federal Rules of Civil Procedure provides the standard for summary judgment: Summary judgment should be granted when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *Avia Group International, Inc. v. L.A. Gear California, Inc.,* 853 F.2d 1557, 1560 (Fed.Cir.1988) (citing Fed R.Civ.P. 56); *Moeller v. Ionetics, Inc.,* 794 F.2d 653, 657 (Fed.Cir.1986) (same). Summary judgment is as appropriate in patent cases as in other cases. *Avia Group,* 853 F.2d at 1561 (citations omitted).

The burden of proving that there are no genuine issues of material fact rests on the moving party. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Summary judgment may be granted if there is "evidence that is merely colorable ... or [that] is not significantly probative." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986) (citations omitted). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248, 106 S.Ct. at 2510. Furthermore, reliance on mere assertions in the pleadings is not permissible. *Id.* There must be enough evidence to enable a reasonable jury to find for the nonmoving party on the issue for which summary judgment is sought. *Id.* at 249, 106 S.Ct. at 2510; *Avia Group,* 853 F.2d at 1560.

If the nonmoving party fails to make a sufficient showing of an essential element of the case for which that party has the burden of proof, the moving party is entitled to summary judgment as a matter of law. *Liberty Lobby,* 477 U.S. at 322, 106 S.Ct. at 2552. But the moving party need not "produce evidence showing the absence of a genuine issue of material fact"; it is sufficient for the moving party to demonstrate to the court that the nonmoving party's case is not supported by the evidence. *Avia Group,* 853 F.2d at 1560 (quoting & citing *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2554). Finally, it is well-settled law that in a motion for summary judgment the evidence should be viewed in a light most favorable to the nonmoving party, *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970), and that this applies with equal force in patent actions. *Avia Group,* 853 F.2d at 1560; *Moeller,* 794 F.2d at 656 (citing *SRI International v. Matsushita Electric Corp.,* 775 F.2d 1107, 1116 (Fed.Cir.1985) (en banc)).

■ Although the same standard for summary judgment is used in patent cases as in other cases, the standard is somewhat more difficult to meet in patent cases, because not only must no genuine issues of material fact exist, but to grant summary judgment properly, the trial court must in addition construe the claim correctly and conclude that it would be not be possible for the trier of fact to find infringement. *Moeller,* 794 F.2d at 656 (citing *Porter v. Farmers Supply Service, Inc.,* 790 F.2d 882, 884 (Fed.Cir.1984)). We address the

defendant's arguments with this summary judgment standard in mind.

B. *Infringement Under the Doctrine of Equivalents.* Although Safe Flight argues in its brief that Sundstrand literally infringes both of its patents, Plaintiff's Answering Brief at 24–25 (D.I. 81.1), earlier in its brief Safe Flight indicates that the configuration which Sundstrand commercially produces does not literally infringe its patents, *id.* at 9, and at oral argument Safe Flight did not argue that its patents are literally infringed, but instead argued that its patents are infringed under the doctrine of equivalents.[3] *See* Transcript at 34–35, 37, 39 (D.I. 95). We conclude, based on these facts together with our independent evaluation of the Safe Flight patents and the Sundstrand products that the Sundstrand Parts do not literally infringe the Safe Flight patents. Thus, summary judgment will be appropriate if Sundstrand can show that its Parts do not infringe the Safe Flight patents under the doctrine of equivalents or, alternatively, if it can show that

Safe Flight's argument that the Sundstrand Parts do infringe its patents under that doctrine is not supported by the evidence.[4]

■ The doctrine of equivalents has existed since *Winans v. Denmead,* 56 U.S. (15 How.) 329, 14 L.Ed. 717 (1853). The Supreme Court's seminal decision on the doctrine was delivered in *Graver Tank & Manufacturing Co. v. Linde Air Products Co.,* 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950). The doctrine of equivalents is an equitable doctrine, at odds with the requirement that patent claims must be precisely worded to warn others of exactly what invention is claimed. *See, e.g., State Industries, Inc. v. A.O. Smith Corp.,* 751 F.2d 1226, 1236 (Fed.Cir.1985). The doctrine was developed to provide additional protection to a patentee by permitting him to maintain an action against one who practices his invention but is not within the literal scope of the patent claims. As constructed by the Supreme Court in *Graver Tank,* the doctrine allows a court to find

3. Although Safe Flight never explicitly abandoned its position that its patents are literally infringed, it is clear to the Court after oral argument that Safe Flight's literal infringement argument is based on one of Sundstrand's pre-production versions of a GPWS with windshear warning that, if produced, would literally infringe the Safe Flight patents. This version is shown in Figure 2, *supra* p. 1148. The windshear warning system in Sundstrand's commercially produced GPWS with windshear warning is shown in Figure 3, *supra* p. 1149. *See* Transcript at 39 (first embodiment [Figure 2] refers to a windshear configuration representing the Safe Flight patents and a Sundstrand pre-production version of a GPWS with windshear warning; second configuration [Figure 3] refers to Sundstrand's commercially produced windshear warning system); *id.* at 35 (first schematic [Figure 2] refers to Sundstrand's preproduction version of a GPWS with windshear warning that Safe Flight agrees has not been commercialized by Sundstrand; second schematic [Figure 3] is Sundstrand's present commercial embodiment); Plaintiff's Answering Brief at 8–9 (plaintiff alleging that one arrangement, the first [Figure 2], infringes Safe Flight patents literally; other arrangement, the second [Figure 3], infringes Safe Flight patents under the doctrine of equivalents). Because there has been no allegation before the Court that Sundstrand's preproduction version has ever been produced commercially, we will move onto the relevant analysis required by this controversy: whether the Safe

Flight patents have been infringed by Sundstrand under the doctrine of equivalents.

4. Likewise, we find that the plaintiff's argument based on 35 U.S.C. § 112, ¶ 6 is without merit. Safe Flight argues that this section requires us "to construe the claims of the patents in suit to cover both the means for generating the rate of change of instantaneous airspeed disclosed in the specification ... and any equivalent means thereof." Plaintiff's Answering Brief at 19. We find the Federal Circuit's statements in *Pennwalt Corp. v. Durand–Wayland, Inc.,* 833 F.2d 931 (Fed.Cir.1987) (en banc), to be controlling. Specifically, there the court stated:

[S]ection 112, paragraph 6, rules out the possibility that any and every means which performs the function specified in the claim *literally* satisfies that limitation.... If the required function is not performed *exactly* in the accused device, it must be borne in mind that section 112, paragraph 6, equivalency is not involved.... [It is erroneous to argue that] if an accused structure performs the function required by the claim, it is per se structurally equivalent. That view entirely eliminates section 112, paragraph 6, restriction and has been rejected [by] the ... precedent of this court.

*Id.* at 934.

Thus only Safe Flight's argument that its patents are infringed under the doctrine of equivalents will be addressed by the Court.

infringement if the alleged infringer produces a device that "performs substantially the same function in substantially the same way to obtain the same result." *Id.* at 608, 70 S.Ct. at 856 (quoting *Sanitary Refrigerator Co. v. Winters,* 280 U.S. 30, 42, 50 S.Ct. 9, 13, 74 L.Ed. 147 (1929)).

For years, the doctrine of equivalents remained more or less unchanged, being limited only by the fact that "the doctrine [does] not extend (1) to cover an accused device in the prior art, and (2) to allow the patentee to recapture through equivalence certain coverage given up during prosecution." *Pennwalt Corp. v. Durand–Wayland, Inc.,* 833 F.2d 931, 934 n. 1 (Fed.Cir. 1987) (en banc) (citing *Loctite Corp. v. Ultraseal Ltd.,* 781 F.2d 861, 870 (Fed.Cir. 1985)). In *Pennwalt,* the Court of Appeals for the Federal Circuit clarified the doctrine by holding that in order to find infringement under the doctrine of equivalents, a court cannot merely view an invention as a whole, rather it must perform an element-by-element analysis of the patent in suit and must find that each element in the claimed invention, or its equivalent, is found in the alleged infringing product. *Id.* at 935–39.

In *Pennwalt,* the plaintiff alleged that the defendant, Durand–Wayland, infringed claims of its fruit sorter covered by Pennwalt's U.S. Patent No. 4,106,628. After dismissing Pennwalt's contention that its patent was literally infringed, *id.* at 933–34, the court of appeals affirmed the district court's finding that there also was no infringement under the doctrine of equivalents. *Id.* at 934–39. The analysis used by the *Pennwalt* court is applicable in the case *sub judice.*

Initially, the court of appeals in *Pennwalt* stated that "if ... even a single function required by a claim or an equivalent function is not performed by the Durand–Wayland sorters, the [district] court's finding of noninfringement must be upheld." *Id.* at 936. The district court had identified the relevant difference between the patent-

ed device and the alleged infringing device as the fact that certain functions of the claimed inventions were missing from the accused devices. *Id.* at 935. Specifically, the patented device's ability to *continuously* track the positions of the items before each item is discharged and the accused device's inability to do the same was the critical difference between the devices.[5] *Id.*

The court of appeals upheld the district court finding of noninfringement on three grounds. First, the court stated that the plaintiff's expert witness testimony supported the finding that there was no infringement because he testified that the accused device and the patented device perform only "*some of the same type of operations.*" *Id.* at 937. The court of appeals found that this testimony, and the absence of any testimony to the effect that the devices performed each and every function of the other, supported the finding by the district court that some of the functions of the patented device were not performed by the accused infringing device. Thus there could be no infringement under the doctrine of equivalents. *Id.*

Second, the court of appeals noted that the language of the patent should be construed narrowly based on its prosecution history and on the fact that it was not a pioneer invention. This narrow reading, in accordance with the usual rule that a patentee cannot recapture through the doctrine of equivalents certain coverage given up during prosecution, *supra,* resulted in the conclusion of noninfringement. The court found that since the patented invention was merely an improvement in an already crowded field, the addition of the phrases regarding how the sorter worked in the patented device, specifically as to how it continuously tracked the location of an item in transit, was "crucial to patentability," because these phrases narrowed the claim making it was patentable over the prior art. According to the court, in this type of situation, the patent claims

---

**5.** As discussed *infra,* another difference between the devices was the position of an element in the invention versus the position of a similar

element in the alleged infringing sorter. 833 F.2d at 938.

" 'should be read in light of the careful phraseology [of functions] chosen by the inventors' because 'the machine disclosed in the patent-in-suit was carefully described so that it did not read on the prior art.' " *Id.* (quoting *Pennwalt Corp. v. Durand–Wayland, Inc.,* 225 U.S.P.Q. (BNA) 558, 570 (N.D.Ga.1984)) [1984 WL 1696]. Moreover, because "the accused machine simply *does not do* what ... 'could' be done," the court of appeals rejected Pennwalt's argument that the accused device necessarily had to infringe its patents because it was possible to find the location of the items using the accused device. *Id.* at 937–38.

Lastly, the court rejected on two grounds Pennwalt's argument that the defendant's shifting of "the position of an operable element" did not preclude a finding of infringement. Pennwalt, in effect, argued that its patent was infringed because, although the accused devices did not make a required comparison between certain values, as prescribed in Pennwalt's patent, the operation and results achieved were the same as those claimed by its patent. First, according to the court, the specific claim language in the patent required that the position indicating means (which was crucial to patentability over the prior art) be responsive to certain specified signals. *Id.* at 938. The court found that there could be no finding of infringement because the accused device did not include any method to respond to those specified signals. *Id.* Second, the court rejected the plaintiff's argument that the memory component of the defendant's device, which stored information as to the weight and color of an item, was the same or substantially the same function as the function of "continuously indicating" where an item is located in the sorter. *Id.* Again, the court found it significant that the record in the case was clear that, before the words "continuously indicating" were added as an additional limitation to the patent, it was unpatentable in view of the prior art which, like the accused device, stored information with respect to sorting criteria in its memory but did not "continuously" track the location of any item. *Id.* As the court stated, "the inventors could not obtain a patent in

which the functions were described more broadly. Having secured claims only by including very specific *functional* limitations, Pennwalt now seeks to avoid those very limitations under the doctrine of equivalents. This it cannot do." *Id.* (citations omitted).

■ Thus, after *Pennwalt,* for infringement to exist under the doctrine of equivalents, an element-by-element identity must exist between the patented invention and the alleged infringing product. Further, a finding of infringement will not be supported: (1) when the plaintiff's expert testimony fails to preclude a finding that there are substantial differences between the patented device and the accused device; (2) where the prosecution history and nature of the patent have limited the patent to a narrow reading, especially where the specific claim language in the patent requires certain functions to be performed and the accused device does not perform these functions, even though there exists the possibility that the accused device could perform them; and (3) where the plaintiff's claims of infringement are based on an argument that the operation and results achieved by the accused device are the same as those claimed by the plaintiff's patent, but certain functions added to achieve patentability are not present in the accused device.

■ Using this standard to determine infringement under the doctrine of equivalents, there is no infringement in this case. Safe Flight's patents claim a system for generating a signal representing windshear. It claimed this system very specifically. Its signal representing windshear is produced by a system that has: (1) the means for generating a signal representing the rate of change of the instantaneous airspeed of the aircraft; (2) the means for generating a signal representing the horizontal inertial acceleration of the aircraft; (3) the means for subtracting the horizontal inertial acceleration signal from the rate of change of the instantaneous airspeed signal to provide a windshear signal representing windshear; and (4) the means for processing the windshear signal to provide

an indication representing the magnitude thereof. In the Sundstrand Parts, it is impossible to identify either the first or the third step in the Safe Flight patents. An isolated signal representing the rate of change of the instantaneous airspeed of the aircraft cannot be identified in the Sundstrand Parts. Similarly, the third step, wherein the horizontal inertial acceleration signal is subtracted from the airspeed rate, cannot be identified in the Sundstrand Parts. Thus, the required element-by-element comparison results in the conclusion that there is no infringement under the doctrine of equivalents and supports the conclusion that Sundstrand is entitled to summary judgment of noninfringement as a matter of law.

Additionally, none of Safe Flight's expert witnesses has either submitted an affidavit or testified during a deposition that it is possible to identify an isolated signal representing the rate of change of the instantaneous airspeed of the aircraft. Thus, we find that there are significant differences between the Safe Flight patents and the Sundstrand Parts and that this finding has not been refuted by the plaintiff's experts. This analysis therefore reinforces our finding that the defendant is entitled to summary judgment of noninfringement.

It is also relevant in this case to examine the prosecution history of the Safe Flight patents after noting that the patents are not pioneer patents in the field of windshear equipment. *See, e.g.,* Petersen Affidavit, Exhibit 5, Nov. 5, 1976, Response to Official Action at 1–3 (discussing the Lambregts and Scholeman patents) (D.I. 55); *Id.,* Exhibit 6, Feb. 7, 1977, Request for Examination at 1–11 (discussing 10 patents as prior art including the Lambregts patents) (D.I. 55).

As first presented to the Patent and Trademark Office (the "PTO"), the '713 patent was rejected as unpatentable over the prior art. Petersen Affidavit, Exhibit 5, Nov. 5, 1976, Response to Official Action

at 2 (D.I. 55). At that time, the claims were amended to use the term "representing" in place of the term "in accordance with" in the original submission. *Id.* at 1. As the applicant stated in the Response to the rejection, the effect of this replacement was to remove the application from the scope of the prior art because the term "in accordance with" was so broad that it could reasonably be interpreted to read on the prior art, but the term "representing" could not read on the prior art. *Id.* at 2–3. In its brief, the plaintiff admits that substituting "representing" for "in accordance with" narrowed the scope of the claims. Plaintiff's Answering Brief at 29 (D.I. 81.1). The claims were narrowed because the prior art disclosed signals that were functions of windshear and which contained the variables necessary to calculate windshear. However, signals covered by the prior art did not actually *represent* any of these values. Thus, it was the applicant's position that "in accordance with" permitted signals to be a function of the values which they were supposed to indicate, but that "representing" did not. It was on this basis that the claims were finally allowed.[6]

We find that the *Pennwalt* court's language is applicable here: The patent claims " 'should be read in light of the careful phraseology [of functions] chosen by the inventors' because 'the [device] disclosed in the patent-in-suit was carefully described so that it did not read on the prior art.' " *Id.* (quoting *Pennwalt,* 225 U.S.P.Q. (BNA) at 570). Safe Flight's argument that the windshear signal is the signal that represents the rate of change of the instantaneous airspeed is therefore misguided, as it seeks to reclaim part of what was given up during the prosecution of its patents. Plaintiff's Answering Brief at 32–34 (D.I. 81.1). Had Safe Flight not replaced the "in accordance with" language with "representing," its argument that the signal "in accordance with windshear" is also the signal "in accordance with the rate of change of the instantaneous airspeed" would prob-

---

**6.** The '905 patent was similarly worded to avoid the same problems. Petersen Affidavit, Exhibit 4, Greene '905 patent, at Column 6 (D.I. 55); *id.,* Exhibit 6, Feb. 7, 1977, Request for Examina-

tion. Thus, our analysis of the effect of the term "representing" in the '713 patent applies to the '905 patent, as well.

ably have merit, but, then again, Safe Flight would not have been granted the patents had it not narrowed the scope of these claims. Because it is unacceptable to "allow the patentee to recapture through equivalence certain coverage given up during prosecution," *Pennwalt*, 833 F.2d at 934 n. 1, this analysis supports our conclusion that the defendant is entitled to summary judgment of noninfringement as a matter of law.

Finally, Safe Flight, like the plaintiff in *Pennwalt*, unpersuasively argues that a change in the "position of an operable element" in the claimed invention is insufficient to remove the accused device from the scope of its patent. Plaintiff's Answering Brief at 33 (D.I. 81.1). Here, it is significant that Safe Flight argues that the change in placement of the summation device in the windshear circuit makes no difference in the *overall* calculation. *Id.* Assuming that this is true, the plaintiff's position would have merit only if *no* difference, either step-by-step or overall, resulted from the change in placement of the summation device.[7] The change in structure of the elements to calculate the signal representing windshear in the Sundstrand Parts does, however, result in a difference. As we stated earlier, in the Sundstrand Parts it is impossible to locate a signal representing the rate of change of the instantaneous airspeed. This difference is significant, and as the court in Pennwalt noted, a patentee, by application of the doctrine of equivalents, cannot avoid language added to patent claims to make a rejected patent application patentable. This analysis, like the others already performed, supports the conclusion that the defendant is entitled to summary judgment of noninfringement as a matter of law.

■ C. *Patentable Subject Matter.*
Safe Flight, however, contends that a genu-

ine issue of material fact exists because it claims, in effect, that there is a dispute over whether Sundstrand has a means for producing a signal representing the rate of change of the instantaneous airspeed of the aircraft. Safe Flight argues that the Sundstrand Parts necessarily have the means for producing such a signal because its Parts produce a windshear signal. According to Safe Flight, because windshear is the difference between the rate of change of the instantaneous airspeed and the horizontal inertial acceleration, then necessarily, the rate of change of the instantaneous airspeed is contained within the windshear signal and if one wanted to, one could find out the value of that signal by analyzing the signal representing windshear. *See* Plaintiff's Answering Brief at 30–34. This argument, however, is a tautological circle that is unsupported in the law.

Safe Flight cannot patent the concept of windshear. *Diamond v. Diehr*, 450 U.S. 175, 185, 101 S.Ct. 1048, 1056, 67 L.Ed.2d 155 (1981). As the Supreme Court stated in *Diehr:*

> Excluded from ... patent protection are laws of nature, *natural phenomena*, and abstract ideas.... An idea of itself is not patentable.... [In this respect,] 'Einstein could not patent his celebrated law that $E = mc^2$; nor could Newton have patented the law of gravity. Such discoveries are "manifestations of ... nature, free to all men and reserved exclusively to none." '

*Id.* (quoting *Diamond v. Chakrabarty*, 447 U.S. 303, 309, 100 S.Ct. 2204, 2208, 65 L.Ed. 2d 144 (1980)) (other citations omitted) (emphasis added). Thus, if we were to accept Safe Flight's argument that Sundstrand infringes its patents because the Sundstrand Parts produce a windshear signal, part of

---

7. The summation device is labelled "3" in Figures 2 and 3 *supra* pp. 1148, 1149. By way of illustration, if the Safe Flight and Sundstrand filters contained the exact same electronic elements, but were arranged differently, this difference would not matter if the two filters were fed the same input and produced the same output, and Safe Flight's position would have merit. Here, however, the filters do not receive the same input. The different arrangement of the filter and of the summation device means that there is different input to the filter, producing a different output from the filter, albeit the same final result is produced in the wind shear signal. This difference is significant and thus, pursuant to *Pennwalt*, Safe Flight's position is without merit.

which is necessarily a "signal" representing the rate of change of the instantaneous airspeed of the aircraft, we would preclude all other companies from producing windshear alert systems. This we will not do.

In *Diehr*, the respondents filed a patent application that claimed an invention covering a process for molding raw, uncured synthetic rubber into cured precision products. *Id.* 450 U.S. at 177, 101 S.Ct. at 1052. Among the many variables that enter into the curing process, controlling the cure time had always presented a problem. *Id.* It was industry practice to calculate the cure time by use of the Arrhenius equation which is dependent on well-known time, temperature, and cure relationships, but it was difficult to measure the temperature of the curing press, the only unknown variable in the equation.[8] *Id.* at 177–78, 101 S.Ct. at 1052. The respondents claimed to have solved this problem by measuring the temperature inside the mold constantly and by feeding these measurements into a computer which repeatedly recalculated the cure time by use of the Arrhenius equation. *Id.* at 178, 101 S.Ct. at 1052. The respondents claimed that the continuous measurement of the temperature inside the mold, the transfer of this information to a computer, the continuous calculations performed by the computer, and the signaling by the computer to open the press when the curing process was complete were all new to the art. *Id.* at 179, 101 S.Ct. at 1053.

Initially, the patent examiner rejected the claims as being unpatentable because the claims covered nonstatutory subject matter under 35 U.S.C. section 101 in that he determined that "the claims defined and sought protection of a computer program for operating a rubber-molding process." *Id.* at 179–81, 101 S.Ct. at 1053–54. Although on appeal the claims were held al-

lowable by the Court of Customs and Patent Appeals, *In re Diehr*, 602 F.2d 982 (C.C.P.A.1979), the Supreme Court granted certiorari to clarify the standard to be applied.

The Supreme Court held that the claims were proper subject matter for a patent. *Id.* 450 U.S. at 184, 101 S.Ct. at 1055. The Court viewed the respondent's claims as covering an industrial process for curing rubber and concluded that such processes historically enjoyed the protection of the patent laws. *Id.* & n. 8. Careful to note that "a process is not unpatentable simply because it contains a law of nature or a mathematical algorithm," *id.* (quoting *Parker v. Flook*, 437 U.S. 584, 590, 98 S.Ct. 2522, 2526, 57 L.Ed.2d 451 (1978)), the Court rejected the notion that the subject matter was unpatentable even though several steps in the process relied on a mathematical formula. *Id.* 450 U.S. at 185, 101 S.Ct. at 1056. However, the Court came to this conclusion only after restating the notion that "laws of nature, natural phenomena, and abstract ideas," *supra*, are not patentable and finding that the respondents did not seek to patent the Arrhenius equation, the mathematical formula employed by its computer in its patent. *Id.* at 187, 101 S.Ct. at 1057. As the Court stated, "Their process admittedly employs a well-known mathematical equation, *but they do not seek to preempt use of that equation.* Rather they seek only to foreclose from others the use of that equation in conjunction with *all* the other steps in their claimed process." *Id.* (emphasis added). It was only when viewed in this light that the Court held that the claims covered patentable subject matter.

In the present controversy, Safe Flight describes its method for calculating windshear alternatively as an algorithm or an algebraic expression. *See, e.g.,* Plaintiff's Answering Brief at 32 (D.I. 81.1);

---

8. The Arrhenius equation for rubber curing can be expressed as follows:

$$\ln v = CZ + x$$

wherein ln v is the natural logarithm of the v, the total cure time; C is the activation constant which is unique to the particular composition of the material being molded; Z is the temperature

of the mold; and x is a geometric constant unique to the configuration of the particular mold. Thus, assuming that the constants, C and x, are computed accurately, it is critical to measure Z accurately, otherwise the cure time will be inappropriate. 450 U.S. at 177 & n. 2, 101 S.Ct. at 1052 & n. 2.

Transcript at 32, 34–35, 38 (D.I. 95). Unlike the respondents in *Diehr*, the plaintiff here *does* seek to preempt use of the general windshear equation. If we were to adopt Safe Flight's argument, it would enjoy complete insulation from any company that marketed a product that produces a windshear signal. Windshear is represented by the difference between the rate of change of the instantaneous airspeed of the aircraft and the horizontal inertial acceleration. Thus, a system that produces a signal representing windshear would necessarily have the means for producing signals representing the rate of change of the instantaneous airspeed and horizontal inertial acceleration. It logically follows that every system that would produce such a signal would thereby infringe Safe Flight's patent claims. To adopt Safe Flight's argument would permit Safe Flight, in effect, to patent the windshear equation. This it cannot do. Safe Flight can patent the use of the windshear signal in its airplane control systems once that signal has been produced, as long as it seeks protection for the use of the windshear equation in conjunction with all of the other steps in the system. It cannot, however, as it seeks to do here, prevent others from using the equation which simply describes a natural phenomenon.[9] *Diehr*, 450 U.S. at 185, 191–92, 101 S.Ct. at 1056, 101 S.Ct. at 1056, 1059–60.

### III. CONCLUSION

The Sundstrand Parts do not literally infringe the Safe Flight patents. Performing an element-by-element comparison of the functions performed by the Sundstrand Parts and the functions claimed by the Safe Flight patents, we further conclude that Sundstrand does not infringe the Safe Flight patents under the doctrine of equivalents. Safe Flight has produced no evidence to contradict our finding that the Sundstrand Parts are substantially different from the invention claimed in the Safe Flight patents in that it is impossible to locate an isolated signal representing the rate of change of the instantaneous airspeed in the Sundstrand Parts. The prosecution history of the patent supports a strict and narrow reading of the claim language which leads to the conclusion that there is no infringement by Sundstrand. Safe Flight's argument that Sundstrand's relocation of the summation circuit in its Parts is not significant misapplies the doctrine of equivalents and is not supported by the claim histories of its patents. Our conclusion that the Sundstrand Parts do not infringe the Safe Flight patents is further supported by the Supreme Court's decision in *Diamond v. Diehr* wherein the Court unequivocally restated the historic rule that "a mathematical formula is not granted the protection of our patent laws." *Id.* 450 U.S. at 191, 101 S.Ct. at 1059 (citing *Gottschalk v. Benson*, 409 U.S. 63, 93 S.Ct. 253, 34 L.Ed.2d 273 (1972)). Since Safe Flight cannot patent an algorithm representing a natural phenomenon, and for all of the other foregoing reasons, the defendant's motion for summary judgment of noninfringement will be granted.

An appropriate order will follow.

---

**9.** In so finding, we do not comment on the validity of the plaintiff's patents. We only refuse to permit Safe Flight to preclude others from use of the general windshear equation. The question of whether its patents cover more than the general windshear equation (and therefore whether its patents cover patentable subject material) was not raised in this dispute and therefore is not addressed by the Court.