**COMPUTROL, INC., an Idaho corporation, Plaintiff,**

v.

**LOWRANCE ELECTRONICS, INC., a Delaware corporation, d/b/a EAGLE ELECTRONICS, Defendant.**

**Civ. No. 93–0439–S–HLR.**

United States District Court, D. Idaho.

Nov. 10, 1994.

1442

James E. Hartley, Denver, CO, Kim J. Dockstader, Boise, ID, for plaintiff.

Steven R. Ormiston, Boise, ID, Robert F. Biolchini, Tulsa, OK, for defendant.

***ORDER ADOPTING REPORT AND RECOMMENDATION***

RYAN, Senior District Judge.

Pursuant to an Order of Reference entered by this court, on September 8, 1994, United States Magistrate Judge Larry M. Boyle entered Findings of Fact, Conclusions of Law, Report and Recommendation (Report and Recommendation) in the above-entitled proceeding. The magistrate recommends that the court grant Computrol's Motion for Preliminary Injunction filed on December 21, 1993.

Pursuant to 28 U.S.C. § 636(b)(1), the parties had ten days in which to file written objections to the magistrate's recommendation. However, at Lowrance's request, this court entered an order which permitted the filing of objections on or before September 30, 1994. *See* Order Granting Time Extension, Denying Request on Page Limit and Plaintiff's Motions, filed September 16, 1994. On September 30, 1994, Lowrance filed its objections to the magistrate's Report and Recommendation as well as an appendix thereto. After being allowed a similar extension of time, Computrol's Brief in Response to Objection to Magistrate's Report and Recommendation was filed on October 20, 1994.

In light of Lowrance's objections, this court must review the entire record and apply the appropriate standard of review (i.e., clearly erroneous or de novo). Then, pursuant to 28 U.S.C. § 636(b)(1)(A) and Local Rule 72.1, this court may affirm, reverse, or modify, in whole or in part, the findings of the magistrate judge.

The court has considered the entire record in this matter, including all of the memoranda, exhibits, and transcripts filed in relation to Computrol's Motion for Preliminary Injunction, as well as Lowrance's objections to the Report and Recommendation and Computrol's response thereto. The court has also reviewed the cases cited by the parties in their memoranda and by the magistrate in his Report and Recommendation. Having conducted this detailed and independent review of the record, in light of the facts presented in this case and the substantive law applicable thereto, this court finds no aspect of the Report and Recommendation to be clearly erroneous or contrary to law.

Indeed, despite Lowrance's vehement objections, this court finds that the magistrate properly concluded that Computrol's Motion for Preliminary Injunction should be granted. The magistrate's report was extremely thorough, well reasoned and well supported in the law. Therefore, rather than reiterating the facts of the case and the arguments of the parties which have been more than adequately addressed by Magistrate Judge Boyle, the court hereby incorporates by reference, accepts in its entirety, and adopts as its own the Report and Recommendation filed on September 8, 1994.

The court notes Lowrance's Application for Oral Argument filed on October 14, 1994, and Computrol's objection thereto filed on October 25, 1994. Based on the comprehensive written record, and given the five-day hearing already conducted by the magistrate, this court finds that further oral argument is unnecessary and would only result in delay. Therefore, Lowrance's request shall be summarily denied.

Based upon the foregoing and the court being fully advised in the premises,

IT IS HEREBY ORDERED that the Report and Recommendation filed September 8, 1994, should be, and is hereby, INCORPORATED by reference and ADOPTED in its entirety.

IT IS FURTHER ORDERED that Computrol's Motion for Preliminary Injunction filed on December 21, 1993, should be, and is hereby, GRANTED as follows:

1. Defendant Lowrance Electronics, Inc. and its officers, directors, agents, servants, employees, assigns, and those acting in concert or participation with Lowrance Electronics, Inc. who receive notice of the injunction should be enjoined from further acts of infringement of United States Patent Number 5,260,912 pending trial on the merits of the above-entitled action, or until further order of the court.

2. Defendant Lowrance Electronics, Inc. should immediately and forthwith cease and desist from selling the ScanPan accessory product which induces, enables, and encourages the infringing side-looking use of certain of defendant's sonar fish finding products, including the Magna II, Magna II+, Magna II (portable), Ultra II, Ultra II+, Ultra II (portable), UntraNav II GPS, and X–55; subject, however, to the giving of security by Computrol.

3. Defendant Lowrance Electronics, Inc. should be ordered to take immediate action to not include, to disable and/or remove from the future *anticipated manufacture* of its products, including but not limited to the Magna II, Magna II+, Magna II (portable), Ultra II, Ultra II+, Ultra II (portable), UntraNav II GPS, and X–55, or other contemplated product or device, that portion of the software in the microprocessor which contains or performs the side-looking function or feature; subject, however, to the giving of security by Computrol.

4. Any preliminary injunction and order should be contingent and should not take effect until Computrol executes and delivers to the court sufficient security, in such sum as Magistrate Judge Larry M. Boyle shall determine.

IT IS FURTHER ORDERED that Lowrance's Application for Oral Argument filed on October 14, 1994, should be, and is hereby, SUMMARILY DENIED.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, REPORT AND RECOMMENDATION

BOYLE, United States Magistrate Judge.

Currently pending before the Court is Computrol's Motion for Preliminary Injunction (Docket No. 12) pursuant to an Order of Reference from the District Court.

Having conducted an extensive evidentiary hearing, carefully reviewed the evidence of record, studied the briefs and written closing argument of counsel, and other submissions of the parties, having conducted its own independent legal research, and otherwise being fully advised, the Court issues the following Findings of Fact, Conclusions of Law, Report and Recommendation pursuant to 28 U.S.C. § 636(b).

## I.

## BACKGROUND

On November 12, 1993, Computrol filed its patent infringement complaint and demand for jury trial (Docket No. 1). On January 21, 1994, Lowrance filed an answer asserting that the claims in question are not infringed and Computrol's claims are invalid under controlling law. Lowrance also filed a counterclaim in which it seeks declaratory judgment of invalidity and non-infringement of the '912 Patent, and alleges Lanham Act violations and common law unfair competition claims against Computrol (Docket No. 25).

A fifteen-day jury trial on the merits of Computrol's complaint and Lowrance's counterclaim is scheduled to commence May 1, 1995 before the Hon. Harold L. Ryan, Senior United States District Judge.

On December 21, 1993, Computrol filed a Motion for Preliminary Injunction (Docket No. 12) and Lowrance filed its Objection to Motion for Preliminary Injunction on January 11, 1994 (Docket No. 15). An evidentiary hearing on Computrol's motion was initially scheduled to commence on April 4, 1994, but subsequently was vacated due to the unforeseen illness of Lowrance's lead patent counsel. The evidentiary hearing was therefore rescheduled to commence on July 18, 1994.

Computrol seeks a preliminary injunction prohibiting Lowrance from infringing United States Patent No. 5,260,912 (hereinafter referred to as the " '912 Patent") through manufacturing and selling various specified models of its sonar fish finders.

The '912 Patent, entitled "Side-Looking Fish Finder," was issued to Mark W. Latham on November 9, 1993, and subsequently was assigned to Computrol. Computrol is the present owner of all right, title and interest in the '912 Patent by assignment from Latham.

After completion of extensive discovery by both parties and numerous prehearing motions, a five-day evidentiary hearing was commenced July 18, 1994. In excess of five hundred documents were placed into evidence by the parties. Testimony was received from numerous witnesses, including experts in a variety of technical and relevant fields including sonar used for fish detection, reverse engineering, software development and analysis, microelectronics hardware and software design, digital signal processing, marketing, sales, and patent law.

## II.

## LEGAL STANDARDS GOVERNING INJUNCTIVE RELIEF IN PATENT INFRINGEMENT ACTIONS

Computrol's Motion for Preliminary Injunction is brought pursuant to Fed.R.Civ.P. 65 and 35 U.S.C. § 283, which provides:

> The several courts having jurisdiction of cases under this title may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable.

Because issuance of an injunction pursuant to Section 283 involves substantive matters unique to patent law, the law of the Federal Circuit governs. *Hybritech, Inc. v. Abbott Laboratories,* 849 F.2d 1446, 1451 n. 12 (Fed.Cir.1988). "A district court must, of course, follow Federal Circuit precedent in a case arising under the patent laws, 35 U.S.C. §§ 1 *et seq.*" *Foster v. Hallco Mfg. Co., Inc.,* 947 F.2d 469, 475 (Fed.Cir.1991).

It is well established by Federal Circuit case law that before an injunction should issue in its favor, Computrol has the burden to demonstrate its right to an injunction in light of the following four factors:

1. Reasonable likelihood of success on the merits;
2. Irreparable harm;
3. The balance of hardships tips in its favor; and
4. The impact of the injunction on the public interest.

*Hybritech,* 849 F.2d at 1451. *See also FMC Corporation v. United States,* 3 F.3d 424 (Fed.Cir.1993); *Intel Corp. v. ULSI System Technology, Inc.,* 995 F.2d 1566 (Fed.Cir. 1993); *New England Braiding Co. v. A.W. Chesterton Co.,* 970 F.2d 878 (Fed.Cir.1992); *Illinois Tool Works, Inc. v. Grip-Pak, Inc.,* 906 F.2d 679 (Fed.Cir.1990); *H.H. Robertson v. United Steel Deck, Inc.,* 820 F.2d 384 (Fed.Cir.1987). In *Nutrition 21 v. United States,* 930 F.2d 867 (Fed.Cir.1991), the Federal Circuit confirmed this long standing rule of law required for obtaining a preliminary injunction in patent infringement actions.

As this court has previously stated:

> Whether a preliminary injunction should issue turns upon four factors: 1) the probability that the movant will succeed on the merits; 2) the threat of irreparable harm to the movant should a preliminary injunction be denied; 3) the balance between this harm and the harm that granting the injunction will cause to the other parties litigant; and 4) the public interest.

*Nutrition 21,* 930 F.2d at 869.

As the Federal Circuit has consistently explained, "[t]hese factors, taken individually, are not dispositive; rather, the district court must weigh and measure each factor against the other factors and against the form and magnitude of the relief requested." *Hybritech,* 849 F.2d at 1451 *citing Roper Corp. v. Litton Systems, Inc.,* 757 F.2d 1266, 1269 n. 2 (Fed.Cir.1985). A weak showing on one factor may be overcome by a strong showing on the others. *Chrysler Motors Corp. v. Auto Body Panels,* 908 F.2d 951, 953 (Fed.Cir.

1990). *See also FMC Corporation,* 3 F.3d at 426.

There exists a statutory "presumption of validity of a patent [which] is a procedural device that places the burden of going forward and the ultimate burden of persuasion at trial on one attacking the validity of a patent." *Nutrition 21 v. United States,* 930 F.2d 867, 869. "However, at the preliminary injunction stage, because of the extraordinary nature of the relief, the *patentee* carries the burden of showing likelihood of success on the merits with respect to the patent's validity, enforceability, and infringement." *Id.* (emphasis in original). While a patentee seeking a preliminary injunction need not establish its case "beyond question," *Nutrition 21,* 930 F.2d at 869–70, it must establish a right thereto in light of the four factors discussed above. *Hybritech,* 849 F.2d at 1451. Further, at the preliminary junction proceeding, the presumption of validity is not evidence which can be "weighed" in determining the likelihood of success. *New England Braiding Co.,* 970 F.2d at 882.

Nevertheless, while a patentee need *not* show that the *patent is valid* before an injunction will issue, the patentee retains the burden to demonstrate entitlement to preliminary relief and also of showing "a reasonable likelihood that *the attack on its patent's validity would fail.*" *H.H Robertson Co. v. United Steel Deck, Inc.,* 820 F.2d 384, 387 (Fed.Cir.1987) (emphasis added). *See also New England Braiding Co., Inc. v. A.W. Chesterton Co.,* 970 F.2d 878, 883 ("While it is not the patentee's burden to prove validity, the patentee must show that the alleged infringer's defense lacks substantial merit"). This rule of law reflects the fact that a patent is presumed valid and the burden at trial of proving invalidity of a patent remains on the challenger, who must establish the patent's invalidity by clear and convincing evidence. *H.H. Robertson,* 820 F.2d at 387. In other words, the patentee's burden of establishing entitlement to preliminary relief "is determined in the context of the presumptions and burdens that would inhere at trial on the merits" with respect to issues of patent validity. *New England Braiding Co.,* 970 F.2d at 883, *quoting H.H. Robertson Co.,* 820 F.2d at 388; *see also Roper Corp. v. Litton Systems, Inc.,* 757 F.2d 1266, 1270 (Fed.Cir.1985).

The Federal Circuit has also made it clear that the grant of a preliminary injunction is reviewed on appeal to determine whether the district court "abused its discretion, committed an error of law, or seriously misjudged the evidence [underlying its findings of fact]." *Nutrition 21 v. U.S.,* 930 F.2d at 869, citing to *Smith Int'l, Inc. v. Hughes Tool Co.,* 718 F.2d 1573, 1579, 219 USPQ 686, 691 (Fed.Cir.), *cert. denied,* 464 U.S. 996, 104 S.Ct. 493, 78 L.Ed.2d 687 (1983).

A district court is specifically required to make findings of fact on which it relies to justify granting a preliminary injunction under Fed.R.Civ.P. 52(a). Sufficient factual findings on the material issues are necessary to allow the Federal Circuit to have a basis for meaningful review. *Nutrition 21,* 930 F.2d at 869. *See also Oakley, Inc. v. Int'l Tropic–Cal, Inc.,* 923 F.2d 167 (Fed.Cir. 1991).

In addition to the foregoing authorities, the Constitutional and statutory basis for jurisdiction, as well as the controlling legal standards established by the Federal Circuit for the various doctrines, theories and defenses asserted by the parties are set forth in Part IV of this Report and Recommendation. All of these authorities, including the foregoing cited in this portion of the opinion, are the legal principles and standards which have guided the Court in this process and upon which it has relied in making its Finding of Facts, Conclusions of Law, Report and Recommendation. Rather than cite those standards and authorities contained in Part IV at this point in the opinion, and again subsequently in the Conclusions of Law section, the parties' attention is directed to that portion of the opinion as containing the legal standards applicable to and controlling the several doctrines, theories, defenses, and issues presented herein.

After making its formal findings of fact in Part III, the Court will analyze the four factors relating to issuance of injunctions in patent infringement actions and will address

all issues raised in light of the evidence of record and governing legal principles.

## III.

## FINDINGS OF FACT

Having carefully considered the testimony of all of the witnesses called at the preliminary injunction evidentiary hearing, having thoroughly reviewed all of the exhibits admitted into evidence, and having considered the legal memoranda, cited authorities and argument of counsel, the Court makes the following Findings of Fact pursuant to Fed. R.Civ.P. 52(a).

To the extent that any conclusions of law contained in Part IV can be considered to be or are deemed to be findings of fact, they are incorporated by reference into these findings of fact.

### A. *The Parties*

1. Plaintiff Computrol, Inc. is an Idaho corporation having its principal place of business in Meridian, Idaho. Computrol is a subsidiary of Armstrong International, Inc.

2. Computrol's engineering, manufacturing, and business facilities are located in Meridian, Idaho, including its Bottom Line, Cannon and OEM enterprises. Computrol, under the trade or brand name Bottom Line, designs, manufactures and sells several models of computerized fish finding products, including its "side-looking" sonar devices.

3. Defendant Lowrance Electronics, Inc. is a Delaware corporation with its principal place of business in Tulsa, Oklahoma. Lowrance does business as Eagle Electronics, a trade or brand name used by Lowrance to identify and distinguish certain of its products.

4. Lowrance designs, manufactures and markets sonar instruments, global positioning systems ("GPS") and Loran-C receivers and navigation plotters and mapping products under the "Lowrance" and "Eagle" trade names throughout the United States and twenty-six foreign countries.

5. Computrol and Lowrance compete with other manufacturers in the market of computerized sonar devices that are principally used by sportsfishermen to locate fish. Both parties manufacture and sell computerized sonar devices that are intended to be used by fishermen, which products have been referred to in this litigation as "side-looking" fish locating sonar devices.

### B. *Sonar Fish Finding Devices*

6. Sonar involves the transmission of sound pulses in water and the detection and analysis of echoes from sound pulse and from other sources in the water, from which process the term is derived: *SO*und *NA*vigation and *R*anging.

7. In a sonar device, a pulse of sound energy is sent out by a sound source or "transducer" through the water. When this sound energy pulse strikes an object, the sound energy is reflected back towards the sonar device as an echo. Echoes from one or more sources can be received during each sounding or, as described during the hearing, a "ping." By analyzing these reflected echoes, a sonar device can perform its function of detecting and locating objects in the water, such as the bottom and bottom structure, logs, fish, and a number of other submerged targets.

8. Sonar analysis requires the integration of hardware, including transmitters, receivers, amplifiers, microprocessors and display devices or components, and software. The software is typically embedded in the microprocessors and transmits instructions which cause the hardware to transmit pulses, the receivers, amplifiers and other hardware to receive and process echoes, and the display device to display information to the operator.

9. A fundamental principle upon which all sonar is based is the principle that sound travels through water at a constant speed.

10. Sound traveling through water is deflected by contact with objects in the water, by contact with the surface of the water and the bottom of the body of water and by contact with floating and resting debris, plants and changes in temperature of layers of water. The combination of background noise and deflection of sonar pulses from contact with the surface, the bottom, debris

and other extraneous objects is known as reverberation or clutter.

11. Sonar is used in the scientific community to study and map geophysical features of the ocean. Sonar is used in commercial fishing to locate fish populations. Sonar is also used by recreational fishermen and sportsfishermen to locate the presence of fish.

12. Fish detectors for commercial or scientific use have traditionally been very complex and expensive devices that operate by receiving, storing, and evaluating large amounts of data and displaying complex data patterns for interpretation by highly trained operators. The commercial and scientific sonar fish finders use relatively complex techniques to analyze the entire returned signal.

13. Sonar fish detectors for recreational and sportsfishing have traditionally been "down-looking" detection devices. Generally speaking, down-looking fish finders operate on the theory that transmitting a pulse downward from a boat will result in a strong, identifiable echo from the bottom. Echoes received before the return of the bottom echo are expected to be fish swimming in the water between the boat and the bottom.

14. [REDACTED & UNDER SEAL]

15. [REDACTED & UNDER SEAL]

16. Prior to Computrol's introduction of the Computrol Scout product in 1991, there were no equivalent sonar side-looking fish finders available on the recreational fishing market by any manufacturer for use by sportsfishermen.

C. *Side-Looking Fish Finders*

17. Mark Latham developed the side-looking fish detection method and device of the '912 patent at issue after a discussion with Merrill Armstrong, President of Armstrong International, Inc., the parent company of Computrol, in July, 1990 at the annual trade show of the American Fishing Tackle Manufacturer's Association ("AFTMA"). In that discussion, Armstrong commented on the unfulfilled commercial need for a fish detection device that could detect fish to the side of a boat or pier.

18. Latham's initial reaction to the idea of a side-looking fish sonar system was that the device would not work for a variety of reasons.

19. After Latham concluded that the side-looking device did not necessarily need to find the bottom, Armstrong and Latham discussed other perceived problems associated with fish detection to the side of a boat, including the significant problem created by reverberation or background noise.

20. Armstrong encouraged Latham to develop an economical fish finder that could detect fish in a sideways direction and that Computrol could manufacture and place on the commercial market.

21. In response to Armstrong's encouragement, during July and August, 1990 Latham began working on the side-looking fish detection methodology claimed in the '912 Patent. Subsequently, over the following months, Latham field-tested his fish detection method in a variety of locations.

22. After conducting numerous field tests, Latham concluded that the fundamental problem with a side-looking fish finder was to separate unwanted reverberation from fish echoes. This problem arose because when the sonar transducer was turned horizontally, it was difficult to process and store all of the complex combinations of signals received after transmitting signals in a substantially horizontal direction. It was not until Latham determined that it was less important to identify each and every fish in the water that his method subsequently incorporated into the Scout device came into being. Latham concluded that the average sportsfisherman would not necessarily be interested in identifying all fish in a school, and determined it was acceptable to identify less than all fish within range so long as those fish that were detected were correctly identified. In this way, Latham concluded that fish to the side of a boat within a casting distance would be displayed with a degree of confidence. In this process, Latham decided to minimize false positive results in order to "filter out" non-fish echoes that were inherently problematic when the sonar transducer was pointed in a substantially horizontal direction.

23. The concept that the Computrol side-looking fish finder would actually reject some closely-spaced fish echoes in order to filter out undesirable echoes was described at the hearing by Professor Clarence S. Clay as a "*paradigm shift*" *or a change in* the way people think about a certain problem, concept or idea. Stated another way, and as applied to the circumstances presented here, sonar fish detection methods used prior to the Latham invention sought to identify as many fish as possible. Latham concluded for *the first time that a side-looking fish finder* should seek to detect isolated fish, even though his method admittedly would result in the failure to detect multiple fish or fish located near other echo-producing objects.

24. To obtain the desired results, Latham elected to identify single fish with certainty by discarding complex reverberation signals received from the surface of the water, plants in the water, and large objects. Latham understood that by using this rejection or filtering approach, some schools or groups of fish and some of the largest fish might actually remain undetected. An essential, distinguishing aspect of the Computrol Scout device, which utilizes the '912 Patent methods, is that when two fish are located close together in the water, the Scout will display neither as a fish icon on the product display screen. This filtering or discarding element of the Latham patent is the best illustration of the concept referred to at the hearing as a paradigm shift.

25. Once Latham discovered this rejection concept of detecting fish, he developed what has been referred to as the "Latham filter" which detects fish by looking for echoes which are preceded by a minimum leading space free of echoes, followed by a minimum trailing space free of echoes, for which the "fish" echo has a duration not exceeding a predetermined maximum.

26. After developing this filtering method, Latham built a prototype product and tested it. Receiving favorable results from Latham's prototype, Computrol put the product into full production for the 1991 market year.

27. Computrol built a commercial embodiment of the apparatus claimed in the '912 Patent which employed the methodology described in the specification of the patent. This product, known as the Scout fish finder, was introduced commercially in January, 1991.

28. In 1991, Computrol received wide acclaim and won the "Best of Show" award at the July, 1991 AFTMA convention. In 1992, Computrol was awarded the "Electronic Design and Engineering" Award by Popular Mechanics Magazine which recognizes new uses of electronic technology and is not limited to sporting equipment.

29. The Computrol Scout and subsequent side-looking sonar devices received significant acclaim and praise in the sportsfishing industry, as demonstrated by the publication of numerous magazine and newspaper articles about the devices incorporating the side-looking technology of the '912 Patent.

30. [REDACTED & UNDER SEAL]

31. The Scout device has a display screen with an image of a conical region on which fish icons were displayed. The apex of the conical portion on the display screen represents the transducer. The transducer is the source of the pings or sound transmissions and typically is attached to the boat in which the fisherman is located. The diverging lines of the conical region represent the divergence of the sound transmissions. The display screen of the Scout device also includes a distance display portion located below the conical region. The distance display portion of the screen contains digital numerals indicating the distance to the nearest detected fish.

32. The down-looking sonar fish finders appear to function well, detect fish, and perform a useful function.

33. Professor Clay was initially skeptical about whether the Latham side-looking fish finder device would function. After studying the '912 Patent and conducting laboratory and field tests on the Computrol Scout device, Clay expressed considerable surprise that the Computrol side-looking fish sonar device actually worked as represented by Latham.

34. Since the introduction in 1991 of its Scout device, Computrol continues to market and sell commercial products embodying the claimed technology of the Latham Patent under its Sidefinder trademark. Computrol's expanded product line of fish finders incorporating its Sidefinder technology now includes the Stalker fish finder, the Fishin' Buddy unit and four Tournament lines of fish finders.

35. Computrol has been successful in the market and in placing its Fishin' Buddy product with numerous national retail organizations.

36. Before the introduction of the Computrol Scout side-looking product in 1991, there were no equivalent commercial side-looking sportsfishing sonar devices available on the market from any manufacturer.

37. The Computrol Scout and subsequent products created a market for side-looking or side-scanning products in the commercial sportsfishing sonar market.

**D. *Lowrance Manufactures and Markets Side-Looking Device***

38. [REDACTED & UNDER SEAL]

39. [REDACTED & UNDER SEAL]

40. [REDACTED & UNDER SEAL]

41. [REDACTED & UNDER SEAL]

42. Lowrance manufactures and markets numerous down-looking fish finding sonar devices under its "Eagle" label. Several of these products, in addition to their down-looking capability, also are capable of utilizing an Eagle ScanPac, an optional, accessory device which enables the Eagle products to find fish to the side of the boat. These Lowrance products presently include the following units or devices: the Magna II, Magna II+, Magna II (portable), Ultra II, Ultra II+, Ultra II (portable), UntraNav II GPS, and X–55.

As used in this written decision, "Magna II" or "Lowrance device" includes the ScanPac attachment device when used in connection with the Magna II and the other Lowrance products identified.

43. The Lowrance ScanPac optional attachment consists of a transducer, adjustable metal strap, and a "Y" cable.

44. [REDACTED & UNDER SEAL]

45. [REDACTED & UNDER SEAL]

46. The evidence presented at the July 18–22, 1994 hearing establishes that Lowrance is planning on designing, manufacturing and selling sonar fish finding devices with side-looking capabilities in the fall of 1994. However, it is not clear from the evidence whether these anticipated products will use or incorporate the same methodology and/or display screen or the ScanPac attachment as Lowrance's other fish sonar products presently utilize.

**E. *Prosecution of the '912 Patent Application***

47. On May 17, 1991, Computrol filed a patent application with the U.S. Patent and Trademark Office. The application was assigned Serial No. 07/702,278 (the "Original Patent Application"). This application listed Mark W. Latham as the inventor and described the sonar technology of the Latham filter to detect fish in a sideways direction and apprise the sports or recreational fisherman of the location of the detected fish on a display screen.

48. Subsequently, on January 21, 1993, a continuation application was filed and assigned Serial No. 08/007,356.

49. Patent application Serial No. 08/007,-356 and patent application Serial No. 07/702,-278 were both examined in the Patent Office by Primary Examiner Daniel T. Pihulic. As part of his examination of these applications, Examiner Pihulic reviewed numerous U.S. patents and other publications relating to sonar technology.

50. In addition, Examiner Pihulic conducted at least three searches of Patent Office reference files. These searches were directed to Patent Office reference files of Class 367—Communications, Electrical: Acoustic Wave Systems and Devices, in pertinent sonar subclasses.

51. During the period of time Examiner Pihulic was conducting the examination of

patent application Serial No. 08/007,356, his cumulative experience in the Patent Office included examination of several hundred patent applications, many of which involved sonar technology.

52. The '912 Patent was granted to Latham by the U.S. Patent and Trademark Office (the "Patent Office") after examination of original and continuation applications. The '912 Patent is unexpired. A certified original of the '912 Patent and the written assignment was available at the July 18–22, 1994 hearing on the motion for preliminary injunction.

53. Despite Armstrong's role or encouragement in the concept and creation of the Computrol Scout device and the '912 Patent, the Court finds that Mark W. Latham was the sole inventor of the '912 Patent.

### F. *Infringement of the '912 Patent Method Claims*

#### 1. *Interpretation of the Method Claims*

54. The key method claims of the '912 Patent, and the focus of the parties' evidence, are Claims 37, 39 and 40, which provide as follows:

> 37. A method of detecting fish in a body of water, comprising the steps of: transmitting a sound pulse through the water in a predetermined direction, thereafter detecting echoes from said sound pulse which are preceded by a leading space interval free of other echoes and followed by a trailing space interval free of other echoes, rejecting each said detected echo which has a duration greater than a predetermined upper limit, accepting said detected echoes other than said detected echoes rejected in said rejecting step, and interpreting each said accepting echo to be an echo from a fish.
>
> 39. A method of claim 37, wherein said rejecting step includes the step of rejecting each said detected echo for which said leading space interval is less than a first predetermined time duration.
>
> 40. A method of claim 39, wherein said rejected step includes the step of rejecting each said detected echo for which said trailing space interval is less than a second predetermined time duration.

55. There are 59 claims in the '912 Patent. Computrol has taken the position that Defendant infringes at least Claims 4, 22–24, 26, 28–31, 33, 35–44, 47–49 and 51–53. At the July 18–22, 1994 preliminary injunction hearing, Computrol's proof focused on method Claim 40, which is dependent on Claims 37 and 39, and display Claims 48 through 53.

56. Two widely divergent proposed interpretations of these method claims of the '912 Patent were offered by Computrol and Lowrance, through their respective expert witnesses. Therefore, in light of the conflicting testimony, the Court must weigh the conflicting evidence to determine the relative strengths and weaknesses of the parties' evidence.

57. In essence, the "Latham filter" detects fish by looking for echoes which are preceded by a minimum leading space free of echoes, followed by a minimum trailing space free of echoes, for which the "fish" echo has a duration not exceeding a predetermined maximum.

58. The Latham filter as addressed in Claim 40 is the most basic description of the method. The plain language of the claim applies the Latham filter to echoes received during a single sounding, accepting and rejecting each echo. In the basic description, Claim 40 is intended to capture the essence of the invention and ensures the broadest possible coverage under the law.

59. The evidence produced at the hearing suggests that a number of terms in Claim 40 must be interpreted in light of the specification. For example, the specification indicates that "transmitting a pulse through water in a predetermined direction" relates to sonar pulses which are transmitted in "an approximately horizontal direction."

60. The specification also indicates that the term "echo" refers to a signal that has passed the threshold of a hardware filter. It recognized by those skilled in the relevant arts that the threshold may be applied in hardware, in software, or in a combination of the two, and in a single step or combination of steps.

61. To those trained in the sonar art, classifying and detecting objects in the water requires the analysis of echoes received during repeated soundings. Repeated soundings are required whether the echo data is analyzed at each sounding or whether the data is accumulated and analyzed in groups.

62. It is possible to apply the Latham filter to each echo in a single sounding. This is the implementation described in the preferred embodiment of the Latham '912 Patent. In this implementation, echoes are accepted or rejected one by one.

63. To those trained in the sonar art, the term "echo" as used in the above-quoted '912 claims are not necessarily limited to a single sound pulse or single echo; rather, multiple sound pulses and echoes are contemplated by the use of the singular words "echo" and "pulse" in the language of the '912 Patent. The use of the singular term "echo" would therefore appear to have been a drafting choice rather than a claim limitation.

64. It is also well known in the art that multiple soundings can be "stacked" and the data accumulated for each range cell. The data for each range cell are accumulated and analyzed together, which permits the analysis to identify patterns and ignore random events or echoes.

65. Stacking is common in sonar signal processing. The concept of stacking is well known in the sonar art and has been used since the 1930s. It is possible to analyze the results of stacked soundings by computing the total number of detected echoes, looking at averages, or applying some other mathematical formula to "weigh" the echoes received during individual soundings. The Latham filter, which measures the leading space, trailing space, and duration of the signals, could then be applied to the results of the stack.

66. Latham has adopted a conservative implementation of the filter by using an inexpensive microprocessor with limited memory. Through accepting or rejecting each echo on an echo-by-echo basis, Latham further reduced the memory requirements for the microprocessor.

67. [REDACTED & UNDER SEAL]

68. [REDACTED & UNDER SEAL]

69. [REDACTED & UNDER SEAL]

70. [REDACTED & UNDER SEAL]

71. [REDACTED & UNDER SEAL]

72. [REDACTED & UNDER SEAL]

73. [REDACTED & UNDER SEAL]

74. The evidence discussed above strongly suggests that one skilled in the sonar and signal processing art would know that the Latham filter could be applied either to analyze each echo in a sounding, or could be applied to results of a stacking operation. The principles are the same and the Court finds, therefore, that Computrol made a strong showing that Claim 40 should not be limited to an echo by echo analysis as urged by Lowrance. Instead, it would be reasonable to interpret Claim 40 to apply equally to the echo data retrieved and accumulated over multiple soundings.

75. The evidence at the hearing demonstrated that in the case of multiple soundings, those skilled in the art would know to apply a software threshold to eliminate random echoes. Therefore, the phrase in Claim 37 "free of other echoes" can reasonably be interpreted to mean "free of other echoes exceeding the software threshold."

2. ***Function and Operation of the Accused Lowrance Device***

76. [REDACTED & UNDER SEAL]

77. [REDACTED & UNDER SEAL]

78. [REDACTED & UNDER SEAL]

79. [REDACTED & UNDER SEAL]

80. [REDACTED & UNDER SEAL]

81. [REDACTED & UNDER SEAL]

82. [REDACTED & UNDER SEAL]

83. [REDACTED & UNDER SEAL]

84. [REDACTED & UNDER SEAL]

85. [REDACTED & UNDER SEAL]

86. [REDACTED & UNDER SEAL]

87. [REDACTED & UNDER SEAL]

88. [REDACTED & UNDER SEAL]

89. [REDACTED & UNDER SEAL]

90. [REDACTED & UNDER SEAL]

3. *Literal Infringement of the Method Claims*

91. [REDACTED & UNDER SEAL]

92. [REDACTED & UNDER SEAL]

93. [REDACTED & UNDER SEAL]

94. [REDACTED & UNDER SEAL]

95. [REDACTED & UNDER SEAL]

96. [REDACTED & UNDER SEAL]

97. Claim 40 provides: "A method of Claim 39, wherein said rejected step includes the step of rejecting each said detected echo for which said trailing space interval is less than a second predetermined time duration." For purposes of determining infringement, the analysis of the minimum trailing space interval is the same as the analysis of the minimum leading space interval.

98. [REDACTED & UNDER SEAL]

99. [REDACTED & UNDER SEAL]

100. After balancing the relative strength of the parties' evidence respecting literal infringement of the method claims of the '912 Patent, the Court finds, for the limited purposes of these injunctive proceedings, that Computrol has made a strong showing that Claim 40 is literally infringed by the Latham filter found in the side-looking fish detection software of the Lowrance Magna II.

4. *Doctrine of Equivalents*

101. The function described in Claim 40 is detection of fish in a body of water. It has been stipulated by the parties that the '912 Patent and the Magna II devices perform the same function.

102. The Latham filter describes the way of performing the function identified in Claim 40. The result obtained is the interpretation of echoes to be echoes from a fish.

103. The evidence of record establishes a strong likelihood that the Magna II device performs substantially the same function in substantially the same way and achieves substantially the same result as is described in Claim 40 of the '912 Patent.

104. [REDACTED & UNDER SEAL]

105. In sum, Computrol demonstrated that, from the perspective of one with ordinary skill in the art, none of the alleged differences between the method of Claim 40 of the '912 Patent and the Magna II asserted by Lowrance are substantial or add anything of significance to the claimed invention. On balance, the Court is satisfied that Computrol made a strong showing of infringement under the Doctrine of Equivalents.

G. *Infringement of the '912 Patent Apparatus Claims*

106. Claims 48 through 53 of the '912 Patent are the apparatus claims at issue for purposes of Computrol's motion for a preliminary injunction.

107. The evidence indicates that the first and second means described in independent Claim 48 should be interpreted consistently with the method claims, including Claim 37. It is also apparent that the display means should be interpreted consistent with the display set forth in figure 4 of the '912 Patent.

108. Claim 48 of the '912 Patent provides:

> An apparatus for detecting fish in a body of water, comprising: first means for transmitting a sound pulse through the water in a predetermined direction; second means for detecting echoes from said sound pulse and for accepting each said echo representative of a fish; and display means responsive to said second means for selectively providing an operator perceptible indication of a detected fish, said display means including means defining an image of a substantially conical region representative of divergence of said sound pulses in said predetermined direction in said water, said conical region having an apex portion representative of a location of said first means, said display means further including means responsive to said second means for selectively displaying within said conical region said operator perceptible indication of a detected fish.

109. [REDACTED & UNDER SEAL]

110. [REDACTED & UNDER SEAL]

111. [REDACTED & UNDER SEAL]

112. [REDACTED & UNDER SEAL]

113. [REDACTED & UNDER SEAL]

114. [REDACTED & UNDER SEAL]

115. [REDACTED & UNDER SEAL]

116. [REDACTED & UNDER SEAL]

117. [REDACTED & UNDER SEAL]

118. [REDACTED & UNDER SEAL]

119. [REDACTED & UNDER SEAL]

120. [REDACTED & UNDER SEAL]

121. Computrol made a strong showing, for injunctive relief purposes, that Claims 48 through 53 are literally infringed by the side-looking fish finder display of the Magna II and related products.

122. In addition, Computrol established, for purposes of these instant proceedings, that from the perspective of one of ordinary skill in the relevant art, all alleged differences between the Lowrance display and that contained in Claims 48 through 53 of the '912 Patent are not substantial differences and add nothing of significance to the claimed invention.

123. Computrol also made a strong showing for injunctive relief purposes that Claims 48 through 53 are infringed by the side-looking fish finder display of the Magna II and related products under the Doctrine of Equivalents.

### H. *Patent Validity*

#### 1. *Prosecution History Estoppel*

124. Lowrance seeks to limit the scope of the claims by applying the doctrine of prosecution history estoppel. This doctrine provides that when the patent holder took one position during prosecution to overcome the rejection of a claim, a contrary position cannot be asserted in a subsequent infringement suit. In this case, Lowrance argues that statements made to the Patent Office concerning the Teel patent serve to limit the scope of Claim 40 and the other claims.

125. The Teel patent was asserted against prosecution of certain early claims of what ultimately became the '912 Patent by Examiner Pihulic and formed the basis upon which Latham's patent attorney voluntarily cancelled these claims in the preliminary amendment of the continuation patent application filed in January, 1993. The technical pertinence of the Teel patent involved the amplitude level of the echo where an echo above a certain amplitude level indicated a large object such as a tree to be avoided by a rapidly moving boat.

126. In that proceeding, Latham's patent attorney asserted that the claims in question were patentable over Teel because they specified the amplitude level of the detected level be below a defined level measured in decibels. This amplitude level which formed the technical basis to distinguish prosecution Claims 17 and 18 is entirely unrelated to the leading space, trailing space and echo durational requirements of Claims 40 and 48 through 53 at issue here. Computrol has made a strong showing that there was no file history estoppel created by virtue of the amendments to prosecution Claims 17 and 18.

#### 2. *Nonobviousness of the '912 Patent in View of References Presented*

127. The evidence suggests that the scope of the prior art in this action encompasses the field of sonar used for fish detection. The content of the prior art in sonar is directed primarily to fish detection in a downward direction using a single direction pulse, commercial fish detection in multiple directions using moving transmitters or multiple transmitters and scientific sonars using sector scanning.

128. Computrol's patent law expert Sterne testified that in this case that the person of ordinary skill in the art would be an individual having a Bachelor of Science in Electrical Engineering or equivalent experience, and specific experience in sonar and digital signal processing. His definition of the person of ordinary skill in the art was not disputed by other evidence. Accordingly, the Court adopts Sterne's definition of the level of skill of a person of ordinary skill in the art.

129. It is clear to the Court that the technical experts in this case, Drs. Clay, Adams, and Deuser, and Messrs. Johnson-Laird, Latham and Weber, all have superior

skill in the art. However, in light of the widely differing views and opinions expressed by these experts, not all can be correct and thus accepted by the Court in these proceedings. It is sufficient to say that the views and opinions, all rendered with sincerity and conviction, cannot be reconciled and some must unavoidably and of necessity be rejected in the weighing and balancing process.

130. Claim 40 combines three elements: (a) a minimum leading space, (b) a minimum trailing space and (c) a maximum pulse duration. These elements are used to filter echoes received by the transducer and detect fish.

131. Lowrance contends that Claim 40 is obvious in light of the Milano patent in combination with the Solli or "PCT" foreign patent application, the BioSonics article by Ehrenberg, and the "Humminbird 4 ID," a competing sportsfishing consumer sonar device manufactured by Techsonics Industries. Lowrance also contends that Claims 4, 22–23, 26, 28–44 and 47 are either anticipated under 35 U.S.C. § 102, or obvious under 35 U.S.C. § 103.

### 3. *The Milano Patent*

132. From the weight of the evidence presented at the hearing, it appears unlikely that United States Patent No. 4,596,069 issued to Milano on June 24, 1986 describes the Latham filter. Substantial differences between the Latham filter and the Milano Patent exist. For example, if the Latham filter was applied to the second group of echoes shown in Fig. 3, both would be rejected. The first echo would be rejected because the second occurs in the trailing space of the first. The second echo would be rejected because the first echo occurs in the leading space of the second.

133. On balance, Computrol established that the Milano Patent would not teach or describe to one with ordinary skill in the art the fundamental concept underlying the Latham filter, i.e. the rejection of both echoes when they occur too close together.

134. As noted above, the concept that the Latham filter would not detect either of two or more closely-spaced fish. In other words, as evidenced by the Milano Patent itself, fish detection methods used prior to the Latham invention sought to identify as many fish as possible. Latham concluded for the first time that a side-looking fish finder should seek to detect isolated fish, even though his method would result in the failure to detect multiple close fish or fish located near other echo-producing objects.

135. The Latham '912 Patent reflected a new method for analyzing side-looking sonar data to detect fish, a fact confirmed by the evidence indicating that previous fish finders, including the Lowrance Fish ID product and the Humminbird 4 ID, would identify and display fish from two closely spaced echoes.

### 4. *The Solli Application and BioSonics (Ehrenberg) Article*

136. The other materials relied upon by Lowrance are the Solli or "PCT" foreign patent application and the Biosonics article by Ehrenberg.

137. The weight of the expert testimony presented at the hearing suggests that neither the Solli or Biosonics reference describes to a person with ordinary skill in the art a method of fish detection based upon the existence of minimum leading and trailing spaces as described in the '912 Patent.

138. The evidence also suggests that numerous, substantial differences exist between these devices because the Humminbird fish finder identifies fish from two closely spaced echoes and does not use the Latham filter. The Court finds, and thus concludes, that these reference materials, even when combined with the Milano Patent, do not describe, suggest or render obvious the method of fish detection found in Claim 40 to a person with ordinary skill in the art.

139. On balance, the Court finds that Computrol made a strong showing that Lowrance's attack on the validity of the '912 Patent would fail at trial in light of the prior art and references.

### 5. *Obviousness of the Apparatus Claims*

140. Claim 48 describes a display defining an "image of a substantially conical region

representative of divergence of said sound pulses...." Lowrance's evidence may suggest that Claim 48 is invalid because a display based upon the conical region is obvious from (a) sketches in the prior art depicting the operation of a sonar fish finder and (b) displays used in sector scanning sonar.

141. On balance, the Court finds Lowrance's evidence of obviousness of the apparatus claims of the '912 Patent to be relatively weak.

142. The evidence established that samples of similar prior art were before the patent examiner and, nonetheless, Examiner Pihulic allowed Claim 48.

143. In addition, the evidence presented at the hearing strongly indicates that certain prior art references are cumulative and therefore are entitled to little consideration.

144. Lowrance asserted it would have been simple and obvious for Weber to modify the square display of the Fish ID model to make it conical. However, no conical shaped regions appeared on the actual Fish ID display or on products shown in Lowrance's 1989 and 1990 catalogs.

145. Lowrance has not demonstrated examples of prior displays using the combinations of the other features described in Claims 49–53, including fish icons (Claims 49), distance displays (Claims 50–52) and divergence of the conical region (Claim 53). That some of the various features might have appeared individually in other fish finders is not of significance and evidence of what Lowrance *could have* done with its displays is not relevant because what is patentable is the *combination* of elements described in Claims 48 through 53.

146. On balance, the clearly greater weight of the evidence establishes to the Court's satisfaction, for purposes of these injunctive proceedings, a reasonable likelihood that Lowrance will not prove at trial by clear and convincing evidence that Claims 40, and 48 through 53 would have been obvious to one of ordinary skill in the art.

147. Based on all the evidence of record, the Court finds that Computrol made a strong showing of a reasonable likelihood that Lowrance's attack on Claims 40 and 48 through 53 of the '912 Patent would fail during a trial on the merits.

### I. *Irreparable Harm to Computrol*

148. Computrol's early attempt to penetrate the fish finder market was initially successful but was severely limited by Lowrance's subsequent introduction of its fish finders with side-scanning capability in November, 1991. This effect is indicative of a loss of market share which is both difficult to recover and not entirely compensable in money.

149. The technology represented by the '912 Patent is new. The field is competitive and technology changes quickly, so any technical advantage may be temporary and fleeting. Exclusivity is therefore necessary for Computrol to benefit fully from the competitive advantage that flows from innovation.

150. Lowrance has a very large presence in the recreational fish finder market and it will be very difficult for Computrol to make inroads into the market without the exclusivity guaranteed by protection of the patent law. Lowrance also has strong marketing and business association ties and relationships with the large national retail chains which makes it all the more difficult for Computrol to gain a presence in the market.

151. The evidence presented at the hearing demonstrates that Computrol continues to suffer financial losses that could well damage its viability and determine its survival or demise. Although granting an injunction will not ensure immediate financial stability or eventual survival for Computrol, it has shown that an increase in volume of sales of its side-finder technology could effect the economies of scale and increase profitability per unit.

152. Although delay in seeking the equitable relief of a preliminary injunction in a patent infringement matter may weigh against a patent holder, in the present case it is clear that Computrol proceeded in an expeditious manner to obtain injunctive relief.

### J. *Balance of the Hardships*

153. Lowrance is a large company and is not dependent upon sales of its ScanPac ac-

cessory product because it has other product lines directed at markets other than the sport and recreational fishing industry.

154. Computrol is a small company whose principal product line is its line of recreational fish finders with side-looking fish detection capability.

155. Computrol developed a strategy to achieve profitability through development, manufacture, and market of embodiments of the invention claimed in the '912 Patent.

156. Lowrance has diverse product lines and it will not be precluded from manufacturing and selling fish detectors without infringing side-scanning capability as it had done prior to 1991.

157. In the case of an injunction limited to the ScanPac accessory item, Lowrance would still be able to sell the Magna II and related products for use in their down-looking mode.

158. In fiscal year 1992, Lowrance sold a total of [REDACTED & UNDER SEAL] items for total gross sales of [REDACTED & UNDER SEAL]

159. In fiscal year 1993, Lowrance sold a total of [REDACTED & UNDER SEAL] items for total gross sales of [REDACTED & UNDER SEAL]

160. In partial fiscal year 1994, from August, 1993 to January, 1994, Lowrance sold a total of [REDACTED & UNDER SEAL] for total gross sales of [REDACTED & UNDER SEAL]

161. Sales of the optional ScanPac attachment itself, an accessory device which enables certain Lowrance down-looking sonars to side-scan, amount to [REDACTED & UNDER SEAL] percentage of Lowrance's total sales, which were nearly [REDACTED] in 1992 and nearly [REDACTED in 1993. & UNDER SEAL]

162. Lowrance's evidence demonstrates that the Magna series of sonar fish finders manufactured by Lowrance was successful, even before the addition of the side-scan optional attachment, because of its high-definition, high-contrast screen, its on-screen operator's menus, name recognition, environmentally acceptable and compact packaging, and other factors.

163. The Court finds that the Magna series and other Lowrance down-looking products with side-scan capability would continue to be successful even in the absence of the availability of the optional ScanPac accessory item.

164. In addition, the testimony of Weber strongly suggested that the Lowrance down-looking fish detection system worked as well when turned on its side as the alleged infringing side-looking ScanPac accessory. Based on this evidence, it appears that Lowrance is able to minimize the effect of an injunction by simply substituting the down-looking system for the side-looking method in dispute here.

## IV.

## CONCLUSIONS OF LAW

1. To the extent any findings of fact can be considered to be or are deemed to be conclusions of law, they are incorporated by reference into these conclusions of law.

2. This Court has jurisdiction over the parties and the subject matter of this lawsuit, and venue is proper. 28 U.S.C. §§ 1338, 1400(b), 2201, and 2202.

3. The United States patent system has its foundation in the Constitution, which gives Congress the power "to promote the Progress of Science and Useful Arts, by securing for limited times to Authors and Inventors the exclusive right to their respective Writings and Discoveries." U.S. Const., Art. I, § 8.

4. A duly issued patent gives the patent owner the right to exclude others from making, using or selling the patented invention for a limited time (17 years). 35 U.S.C. § 154.

5. Part II of this Report and Recommendation addressing the legal standards governing issuance of injunctions in patent infringement actions is incorporated herein by reference.

6. In a preliminary injunction setting, the Court need not definitively interpret

the patent claims, determine whether infringement has occurred, or rule upon whether the patent is valid. Rather, the Court must only determine whether the patentee has made the requisite showing that it is entitled to preliminary injunctive relief. *See Illinois Tool Works, Inc. v. Grip-Pak, Inc.*, 906 F.2d 679, 681 (Fed.Cir.1990); *see also Hybritech*, 849 F.2d at 1451 and *H.H. Robertson Co.*, 820 F.2d at 384. In the same respect, because this is a motion for *preliminary* relief, "neither party was required to prove his case in full" and the Court's findings and conclusions contained in this decision are "*not binding* at trial." *Illinois Tool*, 906 F.2d at 681 (emphasis in original). *See also Nutrition 21 v. U.S.*, 930 F.2d at 870.

### A. *Infringement of the '912 Patent*

7. The determination of patent infringement is a two step process. First, the claims at issue must be properly interpreted and construed. Second, the court must determine whether the properly interpreted claims encompass the accused device or method. *Conroy v. Reebok Int'l Ltd.*, 14 F.3d 1570, 1572–73 (Fed.Cir.1994); *Hybritech, Inc. v. Abbott Laboratories*, 849 F.2d 1446, 1455 (Fed.Cir.1988).

8. Patent claims are construed in light of the specification, prior art, prosecution history, other claims and expert testimony. *SmithKline Diagnostics v. Helena Lab. Corp.*, 859 F.2d 878, 882 (Fed.Cir.1988).

9. Expert testimony is especially important in patent cases involving complex scientific principles and evidence. *Moeller v. Ionetics, Inc.*, 794 F.2d 653, 657 (Fed.Cir.1986). Because this action involves complex and sophisticated issues of sonar, microelectronics, digital signal processing, and microprocessing, the Court concludes that the instant action is such a case where expert testimony is of particular weight, significance and importance. However, in light of the widely differing views and opinions expressed by these experts, not all can be correct and thus accepted by the Court in these proceedings. Accordingly, those expert opinions which are less credible and cannot be reconciled have been rejected by the Court.

10. Ultimately, the interpretation of the scope of the claims is a matter of law and is reviewed under a *de novo* standard. *McGill, Inc. v. John Zink*, 736 F.2d 666 (Fed.Cir.), *cert. denied*, 469 U.S. 1037, 105 S.Ct. 514, 83 L.Ed.2d 404 (1984).

11. Interpretation of a patent claim may depend on evidentiary material about which there is a factual dispute, requiring resolution of the factual issues as a basis for interpretation of the claim. *H.H. Robertson Co. v. United Steel Deck Inc.*, 820 F.2d 384, 389 (Fed.Cir.1987). Factual determinations underlying the interpretation of patent claims are reviewed on a clearly erroneous standard. *Id.; Hybritech, Inc.*, 849 F.2d at 1455.

12. Because this action involves significant factual disputes of both facts and opinion, it is necessary for the Court to consider and weigh the relative strength of the parties' evidence, as set forth above in Part III, Findings of Fact.

13. Having resolved the factual disputes for purposes of the instant motion for preliminary relief, the Court concludes that Computrol has shown and demonstrated a reasonable likelihood of success in proving during a trial on the merits that Claims 40 and 48 through 53 of the '912 Patent are literally infringed by the accused Lowrance ScanPac device, which can presently be implemented on the following Lowrance products: the Magna II, Magna II+, Magna II (portable), Ultra II, Ultra II+, Ultra II (portable), UntraNav II GPS, and X–55.

14. The Doctrine of Equivalents, correctly stated, allows a patentee to bring a cause of action for infringement against the producer of a device if it performs *substantially* the same function in *substantially* the same way to obtain *substantially* the same result. *Graver Tank & Mfg. Co. v. Linde Air Prod. Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950) (emphasis added); *see also Dolly, Inc. v. Spalding & Evenflo Companies, Inc.*, 16 F.3d 394 (Fed.Cir.1994), 62 USWL 2547, 29 USPQ2d 1767 (Feb. 8, 1994).

15. The Doctrine of Equivalents has equitable foundations which prevent one from evading patent claims by insubstantial changes. *Charles Greiner & Co., Inc. v. Mari-Med Mfg., Inc.,* 962 F.2d 1031, 1036 (Fed.Cir.1992).

16. Having resolved the factual disputes for purposes of the instant motion for preliminary relief and made the necessary findings of fact, the Court concludes that Computrol has made a strong showing that it has a reasonable likelihood of success in proving during trial on the merits that Claims 40 and 48 through 53 of the '912 Patent are infringed under the Doctrine of Equivalents by the accused Lowrance ScanPac device, which can presently be implemented on the following Lowrance products: Magna II, Magna II Plus, Magna II portable, Ultra II, Ultra II Plus, Ultra II portable, Ultra Nav II GPS and X-55 because the accused device performs *substantially* the same function in *substantially* the same way to obtain *substantially* the same result.

17. In applying the Doctrine of Equivalents, care must be taken to show that range of equivalents does not ensnare the prior art. *We Care, Inc. v. Ultra-Mark Int'l Corp.,* 930 F.2d 1567, 1571 (Fed.Cir.1991).

18. Based on the evidence of record, the application of the Doctrine of Equivalents in this action does not ensnare the prior art and therefore the doctrine is properly applied to Claims 40 and 48 through 53 of the '912 Patent.

**B. *Validity of the '912 Patent***

19. At trial the '912 Patent is presumed to be valid by statute. 35 U.S.C. § 282. The party challenging the validity of the patent has the burden of establishing invalidity by clear and convincing evidence at trial. 35 U.S.C. § 282; *H.H. Robertson Co. v. United Steel Deck, Inc.,* 820 F.2d at 387.

The presumption of validity is not evidence in these preliminary injunction proceedings to be weighed in determining likelihood of success. *New England Braiding Co.,* 970 F.2d at 882.

20. The presumption of validity at trial carries with it the assumption that the evidence considered by the Patent Office when granting the patent was material. Evidence was presented at the hearing by Computrol of the prosecution history of the '912 Patent and the evidence of nonobviousness of Claims 40 and 48 through 53 supports a presumption of the validity of the '912 Patent, although the issue of validity is not definitely determined here.

21. To be patentable, an invention must be useful. 35 U.S.C. § 101. Based on the evidence of record, the Court finds the invention claimed in Claims 40 and 48 through 53 of the '912 Patent is useful within the meaning of 35 U.S.C. § 101.

22. A patent must also contain a written description and any required drawings of the invention in sufficient detail to enable a person skilled in the art to which it pertains to make and use the invention. 35 U.S.C. § 112. The specification must also contain a description of the "best mode" contemplated by the inventor for making or using the invention.

23. For inventions involving microprocessor-based technology, the specification need not describe every detail of source code for the microprocessor, provided that one skilled in the relevant art would understand what is intended and know how to carry it out. *In re Hayes Microcomputer Products Inc. Patent Litigation,* 982 F.2d 1527, 1534 (Fed.Cir.1992).

24. Based on the evidence of record, the Court finds that the disclosure of the '912 Patent clearly meets the enablement requirement of 35 U.S.C. § 112.

25. Based on the evidence of record, the Court also concludes that the best mode requirement of 35 U.S.C. § 112 was satisfied by the '912 Patent.

**1. *Nonobviousness and Prior Art***

26. Whether or not a patent is valid on the basis of obviousness is governed by 35 U.S.C. § 103, which provides: "A patent may not be obtained ... if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been

obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."

27. Nonobviousness is a determination of fact which is evaluated in view of the following considerations: (1) the scope and (2) content of prior art; (3) the differences between the prior art and the claims at issue; and (4) the level of skill of a person of ordinary skill in the art. *Graham v. John Deere Co.,* 383 U.S. 1, 17–18, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966).

28. An alleged prior use of technology must be established by clear and convincing evidence. Oral testimony to establish the existence of allegedly anticipatory devices has long been viewed with skepticism. *Sjolund v. Musland,* 847 F.2d 1573, 1578 (Fed. Cir.1988).

29. It is the totality of the claimed invention which is evaluated, and the conditions for patentability of a combination invention are the same as for other inventions. *Lindemann Maschinenfabrik v. American Hoist & Derrick Co.,* 730 F.2d 1452, 1462 (Fed.Cir.1984). In fact, the newness or oldness of the various elements of an invention is simply irrelevant. *Environmental Designs, Ltd. v. Union Oil Co.,* 713 F.2d 693, 698 (Fed.Cir.1983), *cert. denied,* 464 U.S. 1043, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984).

30. Based on all the evidence of record, the Court concludes that Computrol has shown a reasonable likelihood that during a trial on the merits Lowrance will fail to establish by clear and convincing evidence its defense that Claims 40 and 48 through 53 of the '912 Patent are rendered obvious through prior art to one with ordinary skill in the sonar and related arts.

### 2. *Objective Indicia of Nonobviousness*

31. The United States Supreme Court and the Federal Circuit have adopted a number of factors, the presence of which constitute strong evidence of nonobviousness. *See e.g., Graham v. John Deere,* 383 U.S. 1, 17–18, 86 S.Ct. 684, 693–94, 15 L.Ed.2d 545 (1966); *Hybritech, Inc. v. Abbott Labs.,* 849 F.2d 1446, 1451 (Fed.Cir.1988).

These objective factors must be considered by the Court and may supply the strongest evidence that an invention was not obvious. *Stratoflex, Inc, v. Aeroquip Corp.,* 713 F.2d 1530, 1538 (Fed.Cir.1983). Of course, a nexus must be established between the objective factor and the claimed invention. *Id.* at 1539.

The objective indicia of non-obviousness include the following factors:

(1) Commercial success of the invention and the accused device and a nexus between the commercial success and the technical quality of the patented subject matter.

(2) Evidence of copying of the claimed invention.

(3) The prior failure of others, including the alleged infringer, to develop a similar device.

(4) Unexpected results, surprise and amazement by experts.

(5) Evidence that the invention solves a long-standing problem or long-felt need in the industry.

*See Specialty Composites v. Cabot Corp.,* 845 F.2d 981, 991 (Fed.Cir.1988); *Akzo N.V. v. United States ITC,* 808 F.2d 1471, 1481 (Fed. Cir.1986); *Panduit Corp. v. Dennison Mfg. Co.,* 810 F.2d 1561 (Fed.Cir.), *cert. denied,* 481 U.S. 1052, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987); *Interconnect Planning Corp. v. Feil,* 774 F.2d 1132, 1144 (Fed.Cir.1985); *In re Piasecki,* 745 F.2d 1468, 1475 (Fed.Cir.1984).

32. Computrol made a strong showing of the initial commercial success of its Scout side-scanning commercial sonar fish finder as well as the subsequent commercial success of the accused Lowrance device, which tends to establish that the claims in the '912 Patent would not be obvious to one of ordinary skill in the relevant art. Computrol also proved a sufficient nexus between this commercial success and the quality of the invention itself to satisfy this requirement.

33. Computrol also made a strong showing of copying of the Scout's display screen, which supports a finding that the display claims of the '912 Patent, Claims 48 through

53, would not have been obvious to one with ordinary skill in the art.

34. On balance, the Court concludes that Computrol made a strong showing that the foregoing objective indicia of nonobviousness exist and support a finding that Claims 40 and 48 through 53 of the '912 Patent are not obvious.

35. In this respect, the evidence demonstrated that a Lowrance design engineer with Lowrance management's knowledge attempted but failed to successfully design a side-looking fish finder in 1988. Although Weber testified at trial that the engineer was not authorized to develop a side-looking device, it appears from Williams' designated deposition testimony that the tests of his side-looking sonar device were fairly extensive and well known to Lowrance management, who did not discourage his project at the time. In addition, although there is some evidence that Williams' side-looking project was successful, the actual, recorded test results lead to the opposite conclusion. To the extent this paragraph can be considered a finding of fact, it is so deemed.

Therefore, the Court concludes that although there are some questions regarding the value and weight of this element of objective indicia of non-obviousness, Computrol has made a fairly strong showing that Lowrance may have attempted but failed in 1988 to create a side-scanning sonar before the release of the Computrol Scout product in 1991.

36. With respect to the third element of non-obviousness, Computrol made a strong showing of unexpected results, surprise and amazement by experts in both the scientific and commercial sportsfishing sonar communities.

37. The Computrol side-looking consumer sonar device solved a long-standing problem and satisfied a long-felt need in the commercial sportsfishing sonar market for a product with the technical capability to detect fish located to the side of the boat rather than under the boat that did not exist prior to 1991.

38. Computrol met its burden of showing on its motion for preliminary injunctive relief that there is a reasonable likelihood that during a trial on the merits, Lowrance will fail to establish by clear and convincing evidence its defense that Claims 40 and 48 through 53 of the '912 Patent are invalid due to obviousness.

### C. *Irreparable Harm*

39. In matters involving patent rights, irreparable harm has been presumed when the required showing has been made of patent validity and infringement. *H.H. Robertson Co. v. United Steel Deck Inc.,* 820 F.2d 384, 390 (Fed.Cir.1987); *Smith Int'l,* 718 F.2d at 1581. This presumption is derived in part from the finite term of the patent grant, for patent expiration is not suspended during litigation, and the passage of time can work irremediable harm. The opportunity to practice an invention during the notoriously lengthy course of patent litigation may itself tempt infringers. *H.H. Robertson Co.,* 820 F.2d at 390.

40. The nature of the patent grant weighs against holding that monetary damages will always suffice to make the patentee whole, for the principal value of a patent is its statutory right to exclude. The right to exclude recognized in a patent is the essence of the concept of property. *H.H. Robertson Co.,* 820 F.2d at 390, *citing to Connell v. Sears, Roebuck & Co.,* 722 F.2d 1542, 1548 (Fed.Cir.1983).

41. If monetary relief were the sole relief afforded by the patent statute then injunctions would be unnecessary and infringers could become compulsory licensees for as long as the litigation lasts. *Hybritech, Inc. v. Abbott Laboratories,* 849 F.2d at 1457 (Fed. Cir.1988).

42. The presumption of irreparable injury is rebuttable by clear evidence. *H.H. Robertson Co.,* 820 F.2d at 390, *citing Roper Corp.,* 757 F.2d at 1272. The presumption of irreparable injury properly arises in this action and Lowrance has the burden to rebut this presumption by clear evidence because Computrol has made a strong and clear showing of a reasonable likelihood that it will prevail on the issues of patent infringement and validity at trial.

43. Lowrance has presented evidence that it is capable of paying money damages in the event of a judgment on the merits in favor of Computrol. In this regard, the law is well established that "[p]ast applications of the concept that *no* patentee could *ever* be irreparably harmed when an alleged infringer is capable of responding in damages frequently disserved patentees and the patent system." *Illinois Tool Works, Inc. v. Grip-Pak, Inc.*, 906 F.2d 679, 683 (Fed.Cir.1990) (emphasis in original). "That disservice would not be cured by a rash of patentee motions for preliminary injunctions filed without full basis in equity. Application of a concept that *every* patentee is *always* irreparably harmed by an alleged infringer's pretrial sales would equally disserve the patent system. Like all generalities, neither concept is universally applicable and, knowing that the court will do so, patentees should consider, weigh, and balance all of the equitable circumstances, in light of the established jurisprudence, before moving for a preliminary injunction." *Id.*

44. The Court concludes that Lowrance's ability to pay money damages in the event a jury determines it is liable is not sufficient to rebut the presumption of irreparable injury in this action.

45. The Court concludes that Lowrance has failed to rebut the presumption of irreparable injury by clear evidence and the Court discounts Lowrance's claims of devastating harm to itself should an injunction issue.

46. The Court concludes that money damages alone will not be sufficient to fully compensate Computrol and therefore it is entitled to injunctive relief.

47. The Court concludes that when the movant has shown the likelihood of succeeding at trial on the merits and proving that the acts complained of are unlawful, the preliminary injunction preserves the status quo if it prevents future trespasses but does not undertake to assess the pecuniary or other consequences of past trespasses. *H.H. Robertson Co.*, 820 F.2d at 390–91.

48. Computrol has shown the likelihood of proving at a trial on the merits that the acts complained of are a violation of its patent or otherwise unlawful, and a preliminary injunction will preserve the status quo by preventing future trespasses in a side-finder sonar market which Computrol's patented technology created in the first place.

49. On balance, the Court concludes that Computrol has made a strong showing that it will suffer irreparable injury should an injunction not issue and that an injunction will not cause devastating harm to Lowrance.

### D. *Balance of the Hardships*

50. A preliminary injunction is a drastic remedy and the hardship on a preliminarily enjoined manufacturer who must withdraw its product from the market before trial can be devastating. *Illinois Tool Works, Inc.*, 906 F.2d at 683.

51. On the other hand, the hardship on a patentee denied an injunction after showing a strong likelihood of success on validity, enforceability and infringements consists in a frequently and equally serious delay in the exercise of his limited-in-time property right to exclude. *Id.*

52. In the Court's view, neither hardship can be controlling in all cases. Because the Court must balance the hardships, at least in part in light of its estimate of what is likely to happen at trial, it must consider the movant's showing of likelihood of success. *Id.*

53. Although the relative size of a patent infringer should not alone serve as a basis for enjoining or refusing to enjoin continued infringement by that infringer, *Windsurfing International, Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 (Fed.Cir.1986), *cert. denied*, 477 U.S. 905, 106 S.Ct. 3275, 91 L.Ed.2d 565 (1986), in this instant action the disparity in size of the parties is relevant and of importance.

54. The record establishes that Computrol has penetrated the market with its successful Fishin' Buddy product and the Court is satisfied that the evidence supports a finding that Computrol has the manufacturing and marketing capability to eventually enter and compete in the market with its other side-scanning products as well.

55. Computrol initiated the market for commercial fishing side-scanning sonar devices as it presently exists. If competitors can enter that niche of the total commercial sportsfishing sonar market through a non-infringing device, that is not a valid reason to deny protection to a patented device. However, in this action, Computrol has made a strong showing for injunctive relief purposes that Lowrance entered the market through an infringing product.

56. The Court concludes that Computrol's strong showing of infringement of the display and infringement of method claims, and the Court is fully satisfied that an injunction in Computrol's favor is appropriate in this action.

57. Should an injunction be granted by the District Court, harm to Lowrance would certainly exist but that harm would not be as great as the harm to Computrol if an injunction is not granted. The Court reaches this conclusion primarily because Lowrance is a large and diversified company and has a number of different options for mitigating the impact of the Court's injunction, and for the singular important reason that only a small line of its products, the ScanPac device, and others only when used in conjunction with the ScanPac, would be adversely affected by the injunction. Second, the potential damage to Lowrance will be minimized by the posting of a security bond by Computrol.

58. Based on all the evidence of record, the Court concludes that the balance of the hardships tips strongly in favor of Computrol.

**E. *The Public Interest***

59. Although there exists a public interest in protecting rights secured by valid patents, the focus of the district court's public interest analysis should be whether there exists some critical public interest which would be injured by the grant of preliminary relief. *Hybritech,* 849 F.2d at 1458.

The Court concludes that the public interest will not be injured by the grant of preliminary injunctive relief in this action. Rather, the public interest of affording patentees protection of the patent laws will best serve and enhance the public interest.

**F. *Security Bond***

60. Computrol has indicated that in the event the District Court should enter a preliminary injunction, it will post a security bond pursuant to Fed.R.Civ.P. 65(a). The parties stipulated that the Court should defer holding a hearing regarding the amount of the bond until after this decision was rendered. Therefore, in the event the District Court adopts this Report and Recommendation, the issue of the amount of the security bond would need to be subsequently addressed by it or, upon Order of Reference, by the undersigned.

## V.

## DISCUSSION

It must be kept in mind that the issue presented and resolved here is limited to injunctive relief and that a definitive finding of validity, infringement and enforceability has not been determined. Any findings, conclusions or comments made by the Court herein on those substantive issues relate only to the limited scope of this injunctive relief proceeding. Final determination of all issues relating to the merits of the respective claims is clearly and expressly reserved until trial when both parties will prove their respective cases in full. Therefore, to the extent that either party has indirectly urged the Court to find the '912 Patent valid or invalid, infringed or not infringed, enforceable or unenforceable, those final decisions must obviously wait until trial.

The Court does not intend to restate or summarize its Findings of Fact or Conclusions of Law in this section. Those sections speak for themselves and stand on their own. Rather, the purpose of this discussion section is primarily to discuss the elements and circumstances relating to the four controlling factors that are important in the Court's consideration of the issues presented for determination in these proceedings.

At the outset the Court recognizes that the relief sought is extraordinary and acknowledges that granting of a preliminary injunc-

tion is considered a drastic remedy. In the process of reaching its decision, the Court has not considered the presumption of patent validity as evidence or weighed that presumption in determining Computrol's likelihood of success on the merits. Instead, after carefully reviewing the controlling legal standards and the argument and authorities submitted by counsel for the parties, the Court has considered, weighed and balanced only the evidence of record in reaching its decision and recommending that Computrol's motion for preliminary injunction be granted.

To the extent possible, the Court has drafted and written its own Findings of Fact and Conclusions of Law. However, in all candor, during this evaluation and drafting process the Court has conscientiously considered, drawn upon and adopted in whole or in part some findings and conclusions suggested by counsel for both parties. Those suggested portions were adopted by the Court only when they were correct statements of fact or law, and were stated as well as, or in some circumstances better than, the Court's own written findings and conclusions on particular issues.

In addition, it will be obvious to counsel and the parties that the Court conducted its own extensive independent legal research in analyzing the issues presented here.

In considering and determining whether Computrol has a reasonable likelihood of success on the merits, the Court is impressed with the uniqueness of the Computrol side-looking sonar fish finder when viewed and compared in light of the state of the art existing in 1991. When the Scout side-looking fish finder came onto the market in 1991, there were no equivalent sonar products available from any manufacturer. The Computrol Scout device received considerable recognition and acclaim after its introduction at the 1991 AFTMA convention. In addition to receiving awards for its innovative technology, the Scout product was the subject of numerous magazine and newspaper articles concerning this new sonar method of detecting fish. Initially, the Scout device was highly successful because it was the first and only side-looking fish finder on the market in 1991.

It is of considerable evidentiary and factual importance to the nonobviousness and prior art issues that in 1988 and 1989 Phil Williams, a Lowrance design engineer, attempted to design and develop a side-looking sonar fish finder device. The prototype designed and built by the Lowrance engineer was developed to the stage that it was well known to senior engineers and officers of that company. There is considerable dispute over whether that project was authorized or approved by Lowrance, but there is no question that high level Lowrance officers and engineers knew of Williams' attempts to design a side-looking sonar fish finder. Although Mr. Weber testified at the hearing that this engineer was not authorized or directed by Lowrance to develop a side-looking device, it appears from Williams' designated deposition testimony that the tests of his side-looking sonar device were extensive and disclosed openly to Lowrance management, who did not discourage his project at the time. In addition, although there is some suggestion that Williams' side-looking project was successful, the actual, recorded test results lead to the opposite conclusion. The Williams' project was not pursued further by him or by Lowrance. In any event, there were serious attempts in the 1988–89 period to develop a side-looking sonar fish finder that were unsuccessful. Ironically and coincidentally, those efforts were undertaken by a Lowrance engineer.

However, in 1991, immediately after the Computrol side-looking device was released onto the commercial market and received substantial, positive response and publicity, Lowrance's chief engineer, Ronald Weber, purchased a Scout unit at a retail store and tested it at a lake near his cabin. For the next two months Weber devoted his full time efforts to developing a side-looking sonar fish finder for Lowrance. In November, 1991, just months after the successful introduction of the Computrol product on the market, and after Weber tested that product and worked full time on the project at his cabin retreat, Lowrance released on the retail market its first side-looking fish finder product. This side-looking device, the ScanPac, is an attachment unit which can be utilized with

Lowrance's line of down-looking devices giving those products side-looking capacity.

Although there is no direct evidence in the record that Weber reverse engineered the software technology of the Scout unit during his testing and prior to release of Lowrance's side-looking product, there is considerable circumstantial evidence that Lowrance copied nearly every aspect of the Computrol product ranging from the electronic, computer function software methods utilized to analyze the sonar echoes, to the appearance and function of the apparatus display screen.

Prior to 1991, when the Computrol device utilizing the Latham rejection or discarding method was released on the market, the mainstream thinking or conventional wisdom of those in the recreational sonar fish finding industry had not previously considered the method developed by Latham which eliminated or rejected certain return echoes which resulted in no fish image or icon being displayed on the screen in circumstances where two fish were in fact located close together in the water. For the first time, a new technical method had been developed by Latham and was incorporated into the Computrol side-looking product that worked effectively and could be purchased at a price affordable to recreational fishermen.

Both the Computrol and Lowrance products perform essentially the same methodology and electronic process in locating and identifying fish. Regardless of how that process is described, both methods utilize in their respective software processing consideration of the leading space, trailing space, and a duration analysis in the process which ends with displaying fish icons on the screen. Likewise, whether the echoes are referred to as "echoes" or "dots," and whether the process is referred to as involving a "dot accumulator buffer," "sliding window" or otherwise, the respective processes involved in the Computrol and Lowrance side-looking products utilize the same method in detecting, analyzing and displaying the fish located by the sonar pulses. It is not significant that one party refers to the returning sonar pulses as "echoes" and the other refers to the processed sonar pulses as "dots." The processes and methods utilized by Computrol's device and Lowrance's device of storing, analyzing and displaying the results of the returned sonar pulses are virtually identical and it is difficult to make any meaningful distinction between the function of two products and their respective methods of processing the electronic information obtained from the returning sonar pulses. In the Court's view, Lowrance's reference to the returning sonar pulses as being converted to "dots" and thus processed as such rather than "echoes" is a distinction without a difference and is more a matter of semantics than a correct understanding and description of the electronic process actually involved in those two products. There are far more similarities than differences in these two products.

It is clear that both parties' products send out electronic bursts of energy or pulses which return as echoes when they strike an object or objects in the water. When the echo or echoes are returned, they are analyzed by the software. When the debate over the choice of words or semantics used in describing the respective processes is all sorted out, and regardless of whether the choice of words used in describing those respective processes include reference to analysis by a "threshold," "sliding window," "dot buffer accumulator," "stacking," "algorithm," "range cells," "rows," "columns," or other descriptive words and phrases, it is clear that both the Computrol and Lowrance side-looking products employ virtually identical methods of evaluating the *leading space, trailing space,* and *duration* of the returning sound impulses in determining whether to detect and display a fish icon. In this respect, the Court is of the opinion that the vigorous debate asserted by Lowrance improperly focuses on semantics rather than upon the electronic methods and processes utilized by the software.

After considerable analysis and evaluation of the evidence submitted at the hearing, and a careful evaluation of the electronic and computerized processes involved in both products, there appears to be precious little difference in the methods used by the Computrol and Lowrance side-looking products in detecting, analyzing the returning sonar pul-

ses and determining whether to display a fish icon on the screen.

Further, it is the well formed opinion of the Court that the display screens of both products upon which the results of the electronic processes are shown to the fisherman are virtually identical. Both products' display screens have a conical region representing the scope of the sonar pulses, a detected fish is represented and displayed in the conical region by an icon, and the distance in number of feet from the boat to the detected fish is digitally displayed. The similarities in the display screens of the two products are striking and virtually identical in visual appearance and function. Although final determination on all substantive issues is reserved until trial, the evidence is very strong that Lowrance literally copied the layout and appearance of the Computrol display screen when designing its display screen.

Under an analysis of the products in light of the Doctrine of Equivalents, it is undisputed that both products perform the same function of detecting fish in the water. In light of the strong showing that the Lowrance product utilizes the same method and process as that utilized by the Computrol device, the Court concludes for purposes of the instant injunctive relief proceedings that the Lowrance product performs its function in substantially the same way and achieves substantially the same result as the Computrol unit.

Likewise, although the evidence demonstrates that the Milano product was patented in 1986 and used sonar to locate and detect fish, there are substantial differences between it and the Computrol device. The Milano patent information makes it clear that other sonar fish finding products pre-dating 1991 attempt to identify as many fish as possible which is clearly different from the Latham rejection method used by the Computrol method. Even though both the Milano patent and the Computrol product use sonar to locate fish, the former does not indicate that it or prior methods sort out, eliminate, or reject fish actually in the water based on the trailing space, leading space, and duration analysis. After carefully comparing the two patents, the Court is of the

well formed opinion that the Milano patent does not describe the Latham method used in the Computrol device. The same legal conclusion is reached when considering the Solli Application, the Biosonics article written by Ehrenberg, and the software analysis method utilized by competing sonar fish finding products currently on the market.

Based on the strong showing of direct infringement and/or infringement under the Doctrine of Equivalents and that Lowrance's attack on the '912 Patent will fail at trial, the Court is satisfied that Computrol will likely succeed on the merits concerning the validity of the patent and its infringement. Accordingly, the Court concludes that Computrol has carried its burden on the first of the four factors and has demonstrated it is likely to succeed on the merits.

With respect to the second factor of irreparable harm to Computrol if an injunction is not issued, the Court is of the view that monetary damages alone will not be sufficient to fully compensate and protect Computrol. A patent provides protection only for a limited period of time, and in light of rapidly changing technology, that protection can often be temporary and of little comfort to the patentee. Failure to protect the patent for even short periods of time denies the patentee its statutory right to exclude others from utilizing its patented idea or product. If Computrol's motion for preliminary injunction is not granted, this action would proceed to trial in May, 1995, and Lowrance would continue to use and market the method currently used in its ScanPac attachment or incorporated into a single unit. In the meantime, Computrol would not have meaningful opportunity for access to the major chain stores for marketing its product because Lowrance and other manufacturers have a commanding presence in those outlets. In addition, Lowrance has a strong market presence and close business and personal ties with WalMart, K–Mart, BassPro, and other national outlets which have not allowed Computrol's Scout products onto their shelves. The fact that two major manufacturers, Lowrance and Humminbird, having filled much of the available shelf space in the major chain store outlets effectively demonstrates that

Computrol has essentially been precluded from access to some markets largely because of Lowrance's presence in national chain stores. To deny Computrol's motion for injunctive relief would require it to go through another fishing season market, until after the May, 1995 trial, without having an opportunity to market its patented product in the major national chains. Under these circumstances, the continuing absence of a meaningful presence, or an opportunity to compete without an infringing product, for even just one more fishing season in these major national chain outlets, while allowing Lowrance to continue with its current business operation utilizing the ScanPac, or a future adaptation of the side-looking method, will strengthen Lowrance while it will obviously weaken Computrol's financial stability and future market opportunity. Further, to delay protection of its '912 Patent may well permanently preclude Computrol from ever having an opportunity for meaningful access to the major chain stores even if it prevails at trial on the merits in May, 1995.

Computrol is considerably smaller than Lowrance in every respect. Its ability to exclude others from using its patented side-looking technology may well determine Computrol's economic viability and survival. Although Computrol may not be in a position to immediately satisfy all the needs of the market for side-looking commercial fish finders and some sales of side-looking fish finders may inequitably be transferred to third-party competitors, the Court concludes for purposes of these injunctive proceedings that Computrol's patented technology and the original Scout product actually created the market for side-looking commercial fish finders. Without the patented Latham technology, it does not appear that a market for side-looking commercial fish sonar devices would exist. Having created a place in the commercial sportsfishing sonar market for side-looking technology in the first place, Computrol is entitled to protect its product.

In light of all these circumstances, the Court concludes that monetary damages alone, in light of the difficulty of determining damages under the current market conditions, will not be sufficient to fully compensate or protect Computrol's patent and that the only meaningful protection is in the form of injunctive relief.

Accordingly, after weighing all the evidence the Court concludes that Computrol has satisfied its burden on the second factor and has demonstrated it will suffer irreparable harm if an injunction is not issued.

With respect to the third factor, which requires a balancing of the respective hardships that will certainly occur to both parties as a result of either granting or denying the requested injunctive relief, the Court has concluded that the balance of hardship tips sharply in favor of Computrol.

First, Lowrance's sales of the optional ScanPac accessory device, which enables certain Lowrance products to side-scan, amounts to a very small portion of Lowrance's total sales. The Court concludes that an injunction limited solely to the ScanPac accessory product itself, or other Lowrance products when used in conjunction with the ScanPac, would not seriously injure or harm Lowrance. Second, and perhaps more important, prior to the introduction of the Computrol Scout, no other equivalent product existed on the market which detected fish to the side of the boat like the Computrol Scout and the Lowrance Magna II and later models. Prior to the introduction of the Computrol Scout in 1991 and the development of the side-looking commercial sonar market, Lowrance was a successful company and continues to enjoy a strong position in the national and international market. The evidence demonstrates that Lowrance's ability to compete in the marketplace will not be appreciably impaired by an injunction against its ScanPac device or other Lowrance sonar devices when used in conjunction with the ScanPac attachment.

After a careful consideration of all the alternatives, the Court concludes that the balance of hardships in this action tips sharply in favor of Computrol.

With respect to the fourth factor, in light of the strong evidentiary showing made by Computrol on the issues of validity, infringement and enforceability, and that it has clearly carried its burden to demonstrate that it is likely to succeed on the merits at

trial, there is no compelling public interest present here that would be adversely impacted by issuance of a preliminary injunction in Computrol's favor. Rather, the Court concludes that it would be against public policy to deny protection of the patent laws under these existing circumstances.

In summary, having considered each of the four factors individually, and having also weighed and assessed each factor against the other and against the form and magnitude of the injunctive relief requested, and being mindful of the drastic remedy and extraordinary relief sought is not to be routinely granted, the Court concludes Computrol has made the requisite showing that it is entitled to preliminary injunctive relief.

## VI.

## SUMMARY AND CONCLUSION

In this preliminary injunction proceeding, the Court has not definitively interpreted the patent claims, determined whether infringement has occurred, or ruled upon whether the '912 Patent is valid. Those issues are reserved for trial when the parties will prove their respective cases in full. Rather, the Court has only determined whether the patentee has made the requisite showing that it is entitled to preliminary injunctive relief. *Illinois Tool Works, Inc. v. Grip-Pak, Inc.*, 906 F.2d 679, 681 (Fed.Cir.1990); *see also Hybritech,* 849 F.2d at 1451 and *H.H. Robertson Co.,* 820 F.2d at 384.

In this respect, the Court has carefully considered each of the four factors applicable to issuance of a preliminary injunction. *FMC Corp.,* 3 F.3d at 426; *Hybritech,* 849 F.2d at 1451, and *Nutrition 21,* 930 F.2d at 869. Further, the Court has applied the applicable burden of proof standard in the context of the presumptions and burdens that would inhere at trial. *H.H. Robertson Co.,* 820 F.2d at 388.

In the process of considering the four factors as required by Federal Circuit case law, the Court has considered each factor individually as well as collectively, and has weighed, balanced and measured each factor against the other factors and against the form and magnitude of the injunctive relief requested. Having carefully weighed, balanced and evaluated the enormous mass of evidence contained in the record, and when that evidence is considered in light of the four factors, the Court concludes that Computrol has met its burden of making a clear showing that it is entitled to preliminary injunctive relief.

The Court concludes that Computrol has carried and satisfied its burden of showing reasonable likelihood and probability of success on the merits with respect to the patent's validity, enforceability and infringement. Further, the Court is of the view that Computrol has clearly shown a reasonable likelihood and probability that Lowrance's attack on the validity of the '912 Patent will fail.

For the reasons set forth in this opinion, the Court concludes that Computrol will be irreparably harmed should its motion for preliminary injunction be denied.

Further, the Court has carefully weighed and balanced the respective harm to the parties should the injunction be granted or denied. It is the carefully considered and well-formed opinion of the Court that Computrol will suffer far more harm if its motion is denied than Lowrance will be harmed or will suffer if the motion is granted.

The Court also concludes that the public interest will not be harmed in any respect by granting the motion for an injunction. Rather, the public interest will be best served in all respects if the patent laws of the United States are implemented to appropriately protect the property interests provided in a patent.

Finally, for the purposes of granting injunctive relief, the Court has also balanced all of the competing equities, and concludes based on a clear evidentiary showing that it is entitled to the preliminary injunctive relief sought. Accordingly, the Court concludes that Lowrance should be preliminarily enjoined from violating the rights secured by the '912 Patent.

## VII.

## RECOMMENDATION

Based on the foregoing, the Court recommends that the District Court enter an order that Computrol's Motion for Preliminary Injunction (Docket No. 12) be GRANTED as follows:

1. Defendant Lowrance Electronics, Inc. and its officers, directors, agents, servants, employees, assigns, attorneys, and those acting in concert or participation with Lowrance Electronics, Inc. who receive notice of the injunction should be enjoined from further acts of infringement of United States Patent Number 5,260,912, pending trial on the merits of the above entitled action, or until further order of the Court.

2. Defendant Lowrance Electronics, Inc. should immediately and forthwith cease and desist from selling the ScanPac accessory product which induces, enables, and encourages the infringing side-looking use of certain of Defendant's sonar fish finding products, including the Magna II, Magna II+, Magna II (portable), Ultra II, Ultra II+, Ultra II (portable), UntraNav II GPS, and X–55; subject, however, to the giving of security by Computrol.

3. Defendant Lowrance Electronics, Inc. should be ordered to take immediate action to not include, to disable and/or remove from the future *anticipated manufacture* of its products, including but not limited to the Magna II, Magna II+, Magna II (portable), Ultra II, Ultra II+, Ultra II (portable), UntraNav II GPS, and X–55, or other contemplated product or device, that portion of the software in the microprocessor which contains or performs the side-looking function or feature; subject, however, to the giving of security by Computrol.

4. Any preliminary injunction and order should be contingent and should not take effect until Computrol executes and delivers to the Court sufficient security, in such sum as the Court shall determine.

Written objections to this Report and Recommendation must be filed within ten (10) days pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(d) or as a result that party may waive the right to raise factual and/or legal objections in the Ninth Circuit Court of Appeals.

DATED this 8th day of September, 1994.